J. M. KAPENA, Minister of Finance *vs.* EMMA KALELEONALANI *et al.*

IN EQUITY. BEFORE JUDD, C.J.

JULY, 1885.

Defendants having been decreed to be owners of the premises known as "Honolulu Hale" as against the Commissioners of Crown Lands, the Minister of Finance now sues defendants to recover amount of a mortgage on said property, formerly paid by the Government under the belief that the property was Crown Lands.

Held, on demurrer, that the Commissioners of Crown Lands are not necessary parties defendant: that the devisee, not the personal representative, of a deceased owner is the proper person to be sued: and that the Public Treasury, having paid a mortgage on the property under the mistaken idea that it was Crown Land, has a lien on the premises to the extent of its value at the time the mortgage was released.

DECISION OF JUDD, C.J.

The following is a simplified statement of the essential allegations in the bill:

I. Certain premises on Merchant street, in Honolulu, known as "Honolulu Hale," as well as several other parcels of land described in the bill, were the property of Kamehameha IV. in his private capacity, and were not a part of the Royal Domain commonly known as Crown Lands, although they were erroneously understood and believed to be such and were so treated.

II. An Act of the Legislature passed January 3d, 1865, entitled "An Act to relieve the Royal Domain from encumbrances," etc., authorized the Minister of Finance to extinguish

such mortgages on the Crown Lands as might remain unsatisfied after the administrators of Kamehameha IV.'s estate had exhausted the estate belonging to their deceased intestate in his private capacity.

III. The property described in paragraph I was not sold by the administrators, because it was believed to be a part of the Royal Domain, and not the private estate of the deceased King.

IV. The premises above described as "Honolulu Hale," as well as certain Crown Lands, had been encumbered with a mortgage by His Majesty Kamehameha IV., through the intervention of Wm. Webster as trustee, and this mortgage, amounting to $7732, was paid off by the Minister of Finance in pursuance of the said Act of the Legislature of January 3d, 1865, under the belief that all the private estate of Kamehameha IV. had been sold, and the Minister of Finance paid other mortgages and liens amounting in all to the sum of $27,000, towards discharging the debts of Kamehameha IV.

V. The plaintiff is the Minister of Finance, and in behalf of the King and people of this Kingdom makes this demand, and asks for the relief prayed for. The defendant Emma is the widow and statutory heir of one-half of the estate which was of Kamehameha IV.

VI. The premises above described as "Honolulu Hale" were held by the Commissioners of Crown Lands as part of the Royal Domain from the time of the creation of their trust by law until the termination of a suit on the equity side of this Court, brought by defendants against the Commissioners of Crown Lands, by which the said premises were decreed to belong to the defendants.

The bill prays that the premises known as "Honolulu Hale" may be decreed to be chargeable with the amount of the mortgage paid off by the Minister of Finance, and that they be sold to satisfy the same, etc.

Both defendants demur. The questions raised are, first: Are the Commissioners of Crown Lands necessary parties to the bill either as plaintiffs or defendants.

I cannot see that the Commissioners of Crown Lands have now any right or interest in the premises sought to be charged with the payment made, or in the fund sought to be recovered by the Minister of Finance. Their claims have been considered and adjudicated by the Court, and they cannot be again heard.

If the Minister of Finance has paid from the Public Treasury a greater sum than he would if the land in question had been sold to extinguish the mortgage upon it, his right to recover this sum from the owners of the land is unaffected by the fact that the Commissioners of Crown Lands have had possession of the premises and collected its rents, for they are accountable for these rents not to the Minister of Finance, but to the defendants, the holders of the title. The diminution of the supposed extent of the Crown Lands by the decree above referred to in favor of defendants, is a matter not raised by the bill, and the enquiry as to who should be made good in consequence of the diminution, whether the Crown or the Public Treasury, is therefore not pertinent to the issues before me.

I do not think the bill is demurrable on account of the non-joinder of the Commissioners of Crown Lands.

The second question is: Should the executors of the will of the late R. Keelikolani be made parties instead of her heir and devisee.

It is elementary law that it is not necessary to make the personal representatives of a mortgagor parties to a bill for foreclosure of a mortgage upon real estate. See Story's Eq. Jur., Sec. 175. The learned author says this is not necessary even though the mortgage is primarily a debt chargeable upon the personal assets.

If the bill sought to charge the personalty of the deceased defendant with this claim or to recover from it any deficiency over and above the proceeds of her land, her personal representatives should be made parties, otherwise not. It was so held in *Leonard vs. Morris*, 9 Paige, 89. I think the heir and devisee, who holds the title to the real estate sought to be charged with a lien, is the proper party defendant. The case of *Campbell vs. Kamaiopili*, 3 Hawn., 477, is in point.

The objection taken by defendants, that the administrator of Kamehameha IV. had no authority to sell the deceased King's lands in order to pay his debts, I do not think is tenable. The jurisdiction to order such sales when the personal estate is insufficient has been exercised by the Probate Courts of this Kingdom from the time of their creation, and a confirmatory statute was passed by the Legislature of 1876. The administrator did, as a matter of fact, sell many of the King's private lands in pursuance of the authority of the Probate Court.

I do not think that the fact that the law set apart one-fourth of the revenues of the Crown Lands to be devoted to the repayment of the advances made by the Treasury, affects this case.

Nor do I think the issues raised in this case are affected by the subsequent act of 1866, which discharged the Commissioners of Crown Lands from all liability to repay these advances. The law made the grant in relief an absolute gratuity, the object of the Legislature being to relieve the Royal Domain of the mortgages upon it, and thus benefit the reigning Sovereign by enhancing the revenues of the Crown Lands. I can see nothing in the acts indicating that their object was to benefit the heirs-at-law of Kamehameha IV. The reigning Sovereign, Kamehameha V., was not the deceased King Kamehameha IV.'s heir-at-law. The statutory heirs of Kamehameha IV. were his widow and his father.

The remaining question is whether the bill shows title to the plaintiff to relief in equity.

Is there a lien in equity in favor of the Public Treasury upon the premises in question by virtue of the Treasury having paid the mortgage upon it? Is the Minister of Finance subrogated to the rights of the mortgagee?

The decision of these questions involve the discussion of many points not easy of solution.

The duty was by the law cast upon the Minister of Finance in connection with the Commissioners, to negotiate for the redemption of the mortgages, and he was to issue the bonds and use them to "extinguish those mortgages which may remain

unsatisfied after the administrator of his late Majesty's estate has exhausted all the estate belonging to his late Majesty, in a private capacity, which the administrator may be legally entitled to use for the payment of the debts of the estate."

The bill alleges that the Minister of Finance, believing that all the private estate of Kamehameha IV. had been sold in accordance with the provisions of the law, issued $27,000 of Government bonds and extinguished the mortgages, paying the amounts due to the several mortgagees.

Subrogation is defined by Sheldon to be "the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. The substitute is put in all respects in the place of the party to whose rights he is subrogated."

"Subrogation is treated as the creature of equity and is so administered as to secure real and essential justice without regard to form, and is independent of any contractual relations between the parties to be affected by it. It is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter; but it is not to be applied in favor of one who has officiously, and as a mere volunteer, paid the debt of another, for which neither he nor his property was answerable, and which he was under no obligation to pay; and it is not allowed where it works any injustice to the rights of others." Sheldon on Subr., Sec. 1.

Bispham says: "The principle is a general one, and will apply in every instance (except in the case of a mere stranger) where one man has paid a debt for which another is primarily liable." Bispham, Principles of Eq., Sec. 337.

Chancellor Kent, in the leading case in America, *Cheesebrough vs. Millard,* 1 Johns. Ch., 412, says: "It is a rule which is founded on natural justice, and is recognized in every cultivated system of jurisprudence."

The doctrine does not depend upon privity. It is not neces-

sary to show any privity of contract between the Minister of Finance and the mortgagee.

The debt has been paid and the mortgage discharged. But this is not fatal to the application of the doctrine: "although as between debtor and creditor, the debt may be extinguished, yet, as between the person who has paid the debt and the other parties, the debt is kept alive so far as may be necessary to preserve the securities." *Wall vs. Mason*, 102 Mass., 316. This case is an instructive one. A grantee of land, who, through neglect to record his deed, has had the land taken from him on an execution issued upon a judgment rendered against his grantor in an action on a debt secured by a mortgage of the grantor's other land, may maintain a bill in equity against his grantor and the judgment creditor, to be subrogated, to the extent of his loss by the levy, to all the rights of the latter under the mortgage, not required for the full satisfaction of the debt. It was claimed in the demurrer that the bill showed that the mortgage was extinguished and discharged by the levy, so that the judgment creditor had no rights to which the plaintiff could be subrogated or which could be assigned to the plaintiff; also, that the plaintiff omitted to record his deeds as required by law, through no fault of the defendants but through gross negligence, from the consequences of which he had no ground of relief in equity. Chapman, J., says: "The doctrine of subrogation is not founded in contract, either express or implied, but is resorted to for the sake of doing justice between the parties. In the present case, the plaintiff, by neglecting to record his deed, left his land exposed to be attached and taken on execution by the creditor of his grantor. It has been taken and set off by the defendant Thayer. The plaintiff has thus paid his grantor's debt which the grantor ought to have paid himself; and it is but just that he should have the benefit of the security which his grantor had previously given to the creditor for the debt." I will again refer to this case later on.

The mortgage upon the land in question should in equity and

good conscience have been paid by the administrator of the estate of Kamehameha IV. out of the proceeds of the land itself, for it was private land of the King. The Minister of Finance was not a mere volunteer, for it is to be presumed that he was requested to pay this mortgage by the administrator. He cannot be regarded as having made the payment officiously and without any color of obligation to do so. The act in question placed the obligation upon him to discharge the mortgages upon the Crown Lands. In attempting to do this he made the double mistake, first, of paying the mortgage before the administrator had exhausted the private lands of his intestate; and secondly, of paying a mortgage existing upon a private land of the King. But he nevertheless paid a debt which the administrator or the heirs-at-law of the King should have paid, and under the definitions above given of the doctrine of subrogation, he should have the benefit of the security given by the ancestor of the heirs-at-law to the mortgagee.

"Where the owner of premises conveyed to him subject to a mortgage, in ignorance of the lien thereon of a judgment against a former owner, subsequent to the mortgage, pays the mortgage and causes the same to be satisfied of record, he is entitled to have the same reinstated as a lien prior and paramount to the lien of the judgment." *Barnes vs. Mott,* 64 N. Y., 397. Here the Court say: "So much of the judgment as restores the mortgage upon the premises now owned by the plaintiff, paid off and satisfied by the devisees of Burr, the then owners, and reinstates the same as a lien upon the mortgaged premises prior and paramount to the lien of the judgment recovered by Orchard and assigned to the defendant, is clearly right. Upon payment of the mortgage by the then owners of the premises, they were entitled to all the rights of the mortgagee, and to an assignment of the mortgage; and having caused the same to be satisfied under circumstances authorizing an inference of a mistake of fact, equity will presume such mistake and give the party the benefit of the equitable doctrine of subrogation. To do this in this case is to prevent manifest injustice and hardship, and interferes with no superior intervening equities."

Here the payment was made in ignorance of the fact of a judgment lien.

In the case from 102 Mass., the payment was made (or rather the land was levied upon) because the grantee had, through ignorance of law, not recorded his deed.

In the case before us, the Minister of Finance was ignorant of the fact that the mortgaged premises was private land of the King. He acted under the mistaken belief that the land was Crown Land. Is this such a mistake as will entitle him to relief?

The general rule is that ignorance of law will not furnish an excuse for any person, either for a breach or for an omission of duty. I Story's Eq. Jur., 110. The presumption is that every person is acquainted with his own rights, provided he has had a reasonable opportunity to know them. Judge Story says, Id. Sec. 116: "That whatever exceptions there may be to this rule, they will be found to have something peculiar in their character and to involve other elements of decision." Judge Story, Id. 120, says: "The most general class of cases relied on as exceptions to the rule is that class where the party has acted under a misapprehension or ignorance of his title to the property respecting which some agreement has been made or conveyance executed. So far as ignorance in point of fact of any title in the party is an ingredient in any of these cases, they fall under a very different consideration." Numerous cases are given where equity relieves a person who had parted with a title of whose existence he was wholly ignorant. Id. Sections 123, 124, 125.

In 15 American Decisions, 162, the case of *Black vs. Ward,* from 27 Mich., 191, is commented upon and all the principal authorities are well reviewed. I excerpt the following: "The case of *Brigham vs. Brigham,* 1 Ves. Sen., 126, is an important case on this side. The plaintiff had purchased an estate which already belonged to him, under a mistake of law, and the Court ordered the defendant to refund the money, holding that there was a plain mistake, such as the Court was warranted to relieve against."

The Master of the Rolls, Sir John Leach, in a later .case (*Cockerell vs. Cholmley*, 1 Younge and Coll., 418) said that "no man can be held by any act of his to confirm a title, unless he was fully aware at the time, not only of the facts upon which the defect of title depends, but of the consequences in point of law; and here there is no proof that the defendant at the time of the acts referred to was aware of the law on the subject." The annotator adds that he believes the true principle to be deduced.from the cases pro and con, and one which strongly commends itself to our notions of. right and justice, is that laid down by Lord Mansfield in *Bize vs. Dickason*, 1 T. R., 285, namely: That if a man has actually paid what the law would not have compelled him to pay, but what in equity and conscience he might, he cannot recover it back. But when money is paid under a mistake, which there was no ground to .claim in conscience, the party may recover it back again.

The Connecticut cases are in accord with this view. In 19 Conn., 548, *Northrop vs. Graves*, the Chief Justice said: "We do not decide that money paid by a mere mistake in point of law can be recovered back, as if it had been paid by an infant, or by a *femme covert*, or by a person after the statute of limitation has barred the action, or when any other merely legal defense exists against a claim for the money so paid, and which might be honestly retained. But we mean distinctly to assert that where money is paid by one under a mistake of his rights and his duties, and which he was under no legal or moral obligation to pay, and which the recipient had no right, in good conscience, to retain, it may be recovered back in action of indebitatus assumpsit, whether such mistake be one of fact or of law; and this we insist may be done upon the principle of Christian morals and the common law." This principle was reaffirmed in *Stedwell vs. Anderson*, 31 Conn., 139.

I think it is clear from the above cases that where reasons exist in equity and good conscience why the relief should be granted, the fact that the mistake was one of law should not prevent the granting of the relief.

From 2 Pomeroy, Sec. 849, I take the following: "Courts have felt the imperative demands of justice and have aided the mistaken parties, although they have often assigned, as the reason for doing so, some inequitable conduct of the other party which they have inferred or assumed. The real reason for this judicial tendency is obvious, although it has not always been assigned. A private legal right, title, estate, interest, duty or liability is always a very complex conception. It necessarily depends so much upon conditions of fact, that it is difficult, if not impossible, to form a distinct notion of a legal right, interest or liability, separated from the facts in which it is involved and upon which it depends. Mistakes, therefore, of a person with respect to his own private rights and liabilities, may be properly regarded—as in great measure they really are—and may be dealt with, as mistakes of fact. Courts have constantly felt and acted upon this view, though not always avowedly. Lord Westbury openly declares that such misconceptions are truly mistakes of fact."

In the case before me the Minister thought that "Honolulu Hale" was Crown Land. The fair inference from the bill is that he did not know that it was not listed in the statutory schedule of the lands reserved by Kamehameha III. to his heirs and successors. He may have thought, as many have, that all the lands of which Kamehameha III. died seized were Crown Lands whether in the schedule or not.

I cannot hold that this was a mere mistake of law, with a full knowledge of the facts. It was not a naked mistake of fact unattended with any special circumstances, for it seems to me that the Minister may have reposed special confidence in the representations and peculiar knowledge of the administrator of Kamehameha IV.'s estate, who held the evidences of title that the premises in question was Crown Land. It is to be presumed that the administrator thought it was. Fraud or deception on his part is not to be presumed. It seems to me that it was a mutual mistake. In fact the error was common to all who participated in the transaction.

I think the Minister of Finance, representing the Public Treasury, is shown by the bill to have a lien upon the "Honolulu Hale" premises to the extent of the amount of its value at the time the mortgage was released.

The demurrer is overruled.

*Attorney-General Neumann,* for plaintiff.

*A. S. Hartwell,* for Mr. and Mrs. Bishop.

*F. M. Hatch,* for Queen Emma.

Honolulu, July 23d, 1885.