Ramon VELAZQUEZ, et al., Plaintiffs,

v.

NATIONAL PRESTO INDUSTRIES and Day & Zimmerman, Incorporated, both foreign corporations, Defendants.

Civ. Nos. 82–0383, 85–1323.

United States District Court,
D. Hawaii.

March 29, 1988.

David C. Shutter, Alfredo G. Evangelista, Honolulu, Hawaii, for plaintiffs.

Jeffrey Sia, Libkuman, Ventura, Ayabe, Chong & Nishimoto, Honolulu, Hawaii, for Nat. Presto Industries.

Paula Devens, Ikazaki, Devens, Lo, Youth & Nakano, Honolulu, Hawaii, and Norman Russell, Atchley, Russell, Waldrop & Hlavinka, Texarkana, Tex., for Day & Zimmerman, Inc.

## DECISION ON POST–TRIAL MOTIONS REGARDING LIABILITY OF NATIONAL PRESTO INDUSTRIES FOR SETTLEMENT PAID BY DAY & ZIMMERMAN, INCORPORATED

PENCE, Senior District Judge.

The United States Army has a military training ground in the Pohakuloa area of the Island of Hawaii. During a training exercise involving the firing of field guns, thereon, a round of ammunition exploded killing one soldier and injuring others. A damage action was thereafter filed against the two defendant companies who had manufactured and assembled the components of the round of ammunition that exploded.

Prior to trial, at a settlement conference held before this judge on November 24, 1987, the plaintiffs offered to settle their claims for $225,000. Counsel for Day & Zimmerman, Incorporated (D & Z), while insisting that his client was not in any way negligent or at fault in causing the accident which injured the plaintiffs, nevertheless stated that he wished to put a cap on the amount that the plaintiffs might recover, and was satisfied that the $225,000 was a reasonable settlement. He stated to the attorney for National Presto Industries (NPI) that, subject to ultimate approval by the United States government, he was willing to recommend the payment of $150,000 towards the $225,000 settlement, reserving

to D & Z, however, the right to proceed against NPI for contribution as a joint tort-feasor. The attorney for NPI stated that he, too, wished to put a cap on the possible damages, but that he had authority only to pay $50,000 toward the settlement. He, too, insisted that his client was in no way negligent or at fault in causing the accident. At this judge's insistence, he stated that he would try to get authority to advance another $25,000 toward securing the settlement. At the end of that conference, there was a consensus between the plaintiffs and the defendants that the case would be settled for $225,000.

On November 30, 1987, NPI advised D & Z's counsel that NPI would only contribute $50,000 toward the settlement.

On January 20, 1988, this court held a second settlement conference, at which time the basic terms of the November 24, 1987 agreement were finalized. Counsel for D & Z stated that she had authority to contribute $150,000 to the $225,000 settlement with the plaintiffs, on condition that NPI would contribute $75,000, or that if NPI would not contribute $75,000, D & Z would put up the full $225,000 on behalf of both D & Z and NPI, secure a joint tortfeasor release, and then seek contribution from NPI, as had been the position of D & Z on November 24, 1987. NPI refused to contribute more than $50,000. The case was settled. D & Z then proceeded to advance the full $225,000, secured a joint tortfeasor release, and trial on the issue of contribution followed.

At the conclusion of the contribution trial before Judge Fong, the jury submitted a special verdict finding that neither NPI nor D & Z were at fault. Thus, as between the two defendants, there was a zero/zero percentage of causation of the injuries to the plaintiffs.

During the trial, Judge Fong ruled that in the "unlikely event" that the jury would return a no-fault verdict for each defendant, he would have this judge apportion the amounts the defendants should contribute to the $225,000 settlement which D & Z had paid to the plaintiffs.

At the February 16, 1988 hearing before this judge to determine the terms of the settlement conference of January 20, 1988, NPI took and maintained the position that D & Z settled with the plaintiffs for $225,-000, but NPI did not settle with the plaintiffs. It contended that D & Z had to seek contribution from NPI as a non-settling defendant.

It is apparent that NPI took the position that it was a non-settling defendant because under the Hawaii case of *Alamida v. Wilson*, 53 Haw. 398, 495 P.2d 585 (1972), the Hawaii Supreme Court had held that settling defendants who had been found not to be negligent were not entitled to recover from a non-settling defendant on the theory of contribution under the joint tortfeasor's act. Since the settling defendants in that case had not been negligent, they were not joint tortfeasors within the meaning of HRS § 663–11 since they were not persons "jointly or severally liable in tort for the same injury to person or property". The Hawaii Supreme Court did, however, hold that those same settling defendants would be entitled to recover against the non-settling defendants under a theory of equitable subrogation. The *Alamida* case is discussed more fully hereafter.

D & Z maintains that, as a matter of fact, it was both NPI and D & Z which entered into the settlement agreement with the plaintiffs. D & Z maintains it is entitled to $112,500 from NPI either as a joint tortfeasor contribution under HRS § 663–12, equitable subrogation, or restitution.

In the factual background surrounding the settlement are some gray areas. These are indicated by the following excerpts from communications between Ms. Devens, attorney for D & Z, and Mr. Sia, attorney for NPI:

In Mr. Sia's letter to Ms. Devens dated February 11, 1988, he stated in pertinent part:

Because D & Z is settling Plaintiffs' claims on behalf of both Defendants and is paying the entire amount of the settlement, it is unnecessary to have National

Presto execute a settlement agreement between D & Z and Plaintiffs.

. . . . .

... At the outset of the settlement negotiations that effectively resolved Plaintiffs' claims, National Presto was willing to contribute settlement monies together with D & Z to form a settlement package whereby Plaintiffs' claims would be resolved. I was authorized to offer $50,000.00 as the total amount of National Presto's contribution toward that package. Because the total amount Plaintiffs were willing to accept was $225,000.00, that meant D & Z would contribute $175,000.00 to the package.

. . . . .

Obviously, this did not occur because D & Z did not want to pay $175,000.00. Instead it elected to settle Plaintiffs' claims on behalf of both Defendants and pay the full $225,000.00. In turn, National Presto continued to offer its $50,-000.00, while we went back and forth regarding the terms and conditions of the offer. The $50,000.00 was not previously withdrawn.

Now, given the fact that D & Z seriously intends to pursue its cross-claim by way of trial, I am authorized to offer D & Z full and complete settlement of any and all claims it has against National Presto Industries in this case for the aforementioned $50,000.00. I have a settlement check ready for immediate tender if this offer is accepted. (Sia's letter, at 2.)

Mr. Sia's letter illustrates NPI's position that NPI never settled with the plaintiffs. It also shows that NPI did offer $50,000.00 toward the settlement package, and that this amount was not withdrawn after NPI refused to increase its contribution to $75,-000.00. It also makes it clear that the parties intended to litigate between themselves if NPI did not authorize a $75,000.00 contribution to the settlement.

In Ms. Devens' follow-up letter to Mr. Sia, dated February 16, 1988, she stated in pertinent part:

2. At the conclusion of the November 24, 1987 settlement conference, you were to seek authority from NPI by November 30, 1987, to contribute $75,000.00 toward the settlement. At the settlement conference you represented that NPI authorized you to contribute $50,000.00 to the settlement. D & Z was to seek authority from the United States government (such approval usually taking about one month) to contribute $150,000.00 toward the settlement with the Plaintiffs. If D & Z and NPI were unable to agree to these amounts, it was agreed by NPI and D & Z, that there would be a subsequent *contribution trial* at which time the *only* issue to be tried would be the pro rata shares of D & Z and NPI for the $225,000.00.

. . . . .

On Monday, November 30, 1987, you advised me that NPI was authorized to contribute only $50,000.00.

On or about January 5, 1988, I advised you by telephone that:

1). D & Z had authority to contribute $150,000.00 toward the $225,000.00 settlement, provided that NPI contributed $75,000.00; and

2). Since NPI refused to contribute $75,000.00 to the $225,000.00 settlement, D & Z would discharge the $225,000.00 and proceed with a trial on contribution between NPI and D & Z as previously agreed by us at the November 24, 1987 settlement conference.

. . . . .

... At this follow-up settlement conference [January 20, 1988], I recapitulated the terms and conditions arrived at at the November 24, 1987 settlement conference, and related to the court that D & Z had authority to (1) contribute $150,-000.00 to the $225,000.00 settlement with the Plaintiffs on the condition that NPI would contribute $75,000.00 and alternatively, (2) that D & Z had authority to discharge the entire $225,000.00 on behalf of both D & Z and NPI and then to seek contribution from NPI, as previously agreed, on the date and time originally set for trial of the Plaintiffs' case. I indicated that D & Z would proceed on

the second alternative because NPI refused to contributed $75,000.00.

.  .  .  .  .

I also asked whether the $50,000.00 previously offered the Plaintiffs was "on the table" because I wanted the $50,000.00 delivered to D & Z in consideration for its undertaking the joint obligation to discharge the entire $225,000.00. You agreed. (Devens' letter, at 2–4 (emphasis in original) (bracketed material added).)

Ms. Devens' letter illustrates D & Z's position that both defendants settled with the plaintiffs. It also indicates that the amounts the parties agreed to contribute to the settlement amount were each contingent on securing authority from their clients, e.g.,: "If D & Z and NPI were unable to agree to these amounts ... there would be a subsequent *contribution trial*," and "D & Z had authority to contribute $150,000.00 ... provided that NPI contributed $75,000.00." The letter also confirms that NPI originally offered $50,000.00 toward the settlement.

The affidavit of plaintiffs' counsel, Alfredo Evangelista, is in accord with Ms. Devens' position:

7. At the conclusion of the settlement conference of November 24, 1987, I understood that all parties had agreed to a settlement of all the Plaintiffs' claims for $225,000.00 subject to obtaining any necessary approvals. In the case of D & Z, I understood that D & Z needed approximately thirty (30) days to obtain government approval of the settlement.

As counsel for the Plaintiffs, I left the division of contribution for the $225,000.00 settlement up to the Defendants. At the conclusion of the November 24, 1987 settlement conference, it was my understanding that Mr. Sia was to obtain authority from NPI to contribute a certain amount to the $225,000 settlement. If NPI was unable to come up with that amount, then D & Z and NPI would litigate between themselves each Defendant's share of contribution to the $225,000.00 settlement.

As far as the Plaintiffs were concerned, I understood that the Plaintiffs'

claims were settled against D & Z and NPI, jointly and severally, and that Plaintiffs could recover the entire amount of the $225,000.00 settlement from either D & Z or NPI, or from both. I further understood the settlement to be pursuant to the Uniform Contribution Among Tortfeasors Act, Hawaii Rev. Stat. §§ 663–11 through 663–17 (1985).

.  .  .  .  .

On or about January 20, 1988, I attended a second settlement conference before the Honorable Martin Pence, at which time the basic terms of the November 24, 1987 settlement agreement were confirmed:

a) A settlement for $225,000.00 between Plaintiffs and D & Z and NPI, jointly and severally;

b) NPI and D & Z could not agree on the amount each would contribute to the $225,000.00, but D & Z would discharge the entire settlement of $225,000.00 and thereby extinguish the entire liability of D & Z and NPI to the Plaintiffs;

c) D & Z and NPI would litigate the matter of each Defendant's contribution toward the $225,000.00 settlement at a later date;

d) NPI agreed it was a "joint tortfeasor" for contribution purposes; and

e) NPI agreed that the $225,000.00 settlement represented the common liability of NPI and D & Z to the Plaintiffs. (Evangelista Affidavit, at 3–4.)

Mr. Evangelista's Affidavit confirms that NPI intended to contribute "a certain amount" to the settlement. He also states what the other parties apparently also agreed on: "If NPI was unable to come up with that amount [$75,000.00) ], then D & Z and NPI would litigate between themselves each Defendant's share to the $225,000.00 settlement." *Id.* ¶ 7, at 3.

Finally, the court's Order Determining Terms of Defendants' Settlement Understanding ruled:

(1) Solely for purposes of settlement, D & Z and NPI intended to admit common liability to place a cap on the amount the plaintiffs could possibly recover.

(2) D & Z and NPI intended the $225,000 settlement amount agreed to by the plaintiffs to discharge their common liability as *joint tortfeasors* as the term is used in Haw.Rev.Stat. §§ 663–11 through 663–17.

(3) D & Z and NPI intended jointly to settle with the plaintiffs and thereafter determine their relative degrees of possible fault at a contribution trial; the degree of fault for either defendant could range from 0% to 100%.

## A. LAW

Were it not for the Hawaii case of *Alamida v. Wilson*, 53 Haw. 398, 495 P.2d 585 (1972), and its holding on the application of contribution under Haw.Rev.Stat. § 663–12 and equitable subrogation, this court's decision would be easier to make.

In *Alamida*, a passenger was injured when the vehicle in which he was riding struck a utility pole. He sued the driver, who then brought in several third-party defendants: the electric company, the telephone company, two individual defendants (Morse and Keawe), and the County of Hawaii. Before trial, all the defendants except the County settled with the plaintiff. At a later contribution trial, it was determined that the individual defendants (Morse and Keawe) were 0% negligent, the other defendants were 70% negligent, and the County was 30% negligent. The individual defendants then attempted to recover from the County under a joint tortfeasor contribution theory.

On appeal, the Hawaii Supreme Court held that the individual defendants (Morse and Keawe) could not recover under a joint tortfeasor contribution theory because:

Third party defendants Morse and Keawe are not joint tortfeasors within the meaning of HRS § 663–11, as they are not persons "jointly or severally liable in tort for the same injury to person or property." Accordingly, they are not

entitled to recovery on the theory of contribution as set forth in HRS § 663–12. *Alamida*, 53 Haw. at 403, 495 P.2d at 589.

D & Z argue that the case here presents materially different facts from *Alamida* because here, the defendants *both* settled with the plaintiffs, where in *Alamida*, the County did not so settle. This is not material. As this court sees it, the *Alamida* court's focus apparently was on whether the individual defendants Morse and Keawe were found liable or not liable in the contribution trial, and not on the status of the defendant County as a settling or non-settling party.

■ D & Z also argues that *Alamida* was wrongly decided.[1] While it well may have been, nevertheless, under the *Erie* doctrine (*Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)), this court is bound by *Alamida*. Applying *Alamida* to this case (as mandated by the *Erie* doctrine) means that D & Z cannot recover under Haw.Rev.Stat. § 663–12, since, like Morse and Keawe in *Alamida*, D & Z was found to be nonnegligent in a later contribution trial.

The *Alamida* court went on to hold, however, that even though nonnegligent, defendants Morse and Keawe could recover under the theory of equitable subrogation, which it defined broadly as:

... broad enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter; but it is not to be applied in favor of one who has officiously, and as a mere volunteer, paid the debt of another, for which neither he nor his property was under any obligation to pay; and it is not allowed where it works any injustice to the rights of others.

*Alamida*, 53 Haw. at 403, 495 P.2d at 589 (quoting *Kapena v. Kaleleonalani*, 6 Haw. 579, 583 (1885)).

---

**1.** This judge believes that the *Alamida* court wrongly construed and decided the application of Wisconsin's "joint tortfeasor" law to that case. The Richardson court apparently based its "joint tortfeasor" ruling on an obvious erroneous interpretation of the Wisconsin law.

In *Alamida*, the application of equitable subrogation was obvious. The non-settling County was found to be 30% negligent at the contribution trial. Here, the application of subrogation is *not* as obvious, because NPI was determined to be 0% at fault. Indeed, NPI argues that D & Z cannot recover under subrogation because in this matter the jury found that NPI was not negligent.

While NPI's argument has some superficial appeal, *Alamida* is distinguishable from this case. In *Alamida*, the County did *not* settle with the plaintiff. In this case, as this court has already ruled, NPI *did* settle with the plaintiffs. D & Z was not a volunteer.[2] As the Transcript of Hearing on February 16, 1988, at 38, shows:

> JUDGE PENCE: I would hold, here, there was no "volunteer" for $225,000 on the part of D & Z. D & Z had your [NPI's] $50,000 in the package and they [D & Z] said we want to get this over, and we'll put [it] up and your $50,000 goes in and we'll fight out how much more, if any, either side has to pay.

This court's previous ruling on this issue nullifies the precedential force of the cases cited by NPI wherein a settling defendant later pursued a nonsettling defendant, with the burden of proof placed upon the pursuing defendant to show the other defendant was negligent.

D & Z and NPI jointly agreed to settle with the plaintiffs; thus, another type of equitable subrogation becomes applicable, viz., where one co-obligor discharges the entire common debt owed by himself and his co-obligor.

In reviewing the general principles involving the application of subrogation, this court notes that the Hawaii Supreme Court has recognized *American Jurisprudence 2d* as an authority on the doctrine of subrogation. *See, e.g., First Ins. Co. of Hawaii, Ltd. v. Jackson*, 67 Haw. 165, 681 P.2d 569, 571 (1984) (Padgett, J.) (citing 73 Am.Jur.2d §§ 139, 141 (1974)). As a federal court sitting in diversity, this court, therefore, is entitled to follow the Hawaii Supreme Court and similarly rely on several other sections of what the Hawaii Supreme Court recognized as solid authority on the subject.

The doctrine of subrogation is not a fixed and inflexible rule of law or of equity. It is not static, but is sufficiently elastic to take within its remedy cases of first instance which fairly falls within it. Thus, the mere fact that the doctrine of subrogation has not been previously invoked in a particular situation is not a prima facie bar to its applicability. As now applied, it is broad enough to include every instance in which one person, not acting as a mere volunteer or intruder, pays a debt for which another is primarily liable, and which in equity and good conscience should have been discharged by the latter.

73 Am.Jur.2d *Subrogation* § 6, at 602 (1974) (footnotes omitted).

> Subrogation has been characterized as an eminently just doctrine, a pure unmixed equity, one of the benevolences of the law, created, fostered, and enforced in the interest and for the promotion of equity and justice, and to prevent injustice. Being founded on principles of natural reason and justice, it is a highly favored doctrine, which is to be given a liberal application, and which the courts are inclined to extend rather than restrict. Perhaps no doctrine of equity jurisprudence is more beneficial in its operation, and none perhaps stands in higher favor.

*Id.* § 7, at 603 (footnotes omitted).

These general principles urge liberal and broad application of the doctrine of subrogation.

*American Jurisprudence 2d*'s general section on subrogation concerning co-obligors and persons equally bound, provides:

> The fact that payment by one joint debtor ordinarily discharges the debt suggests a difficulty in the way of applying the doctrine of subrogation as between co-obligors. But equity implies an

**2.** *See* Court Order Determining Terms of Defendants' Settlement Understanding, dated February 17, 1988, at 2 (quoted above page 1502–03).

exception to the foregoing rule of payment by keeping alive the debt for the benefit of the co-debtor who pays it. Until the debt is paid, and while the parties remain equally bound, there can, of course, be no subrogation. *But they cease to be equally bound when one obligor discharges an obligation resting on himself and his co-obligor. Both are bound to the obligee, but inter se each is primarily, not equally liable for his own share and secondarily liable for the share of the other, and when he pays the share of such other, all the conditions essential for the application of the doctrine of subrogation arise.* That doctrine is aimed at the doing of justice and equity, and it is eminently calculated to work out exact justice between parties who are bound for the performance of the same obligation.

*Id.* § 62, at 637 (emphasis added).

In this case, D & Z and NPI jointly entered into a settlement agreement with the plaintiffs whereby they jointly "bought the lawsuit" pending against them for $225,000.00. D & Z and NPI were jointly and severally liable to the plaintiffs on this settlement agreement, an oral contract. As Mr. Evangelista has stated: "As far as the Plaintiffs were concerned ... Plaintiffs could recover the entire amount of the $225,000.00 settlement from either D & Z or NPI, or from both." [3]

■ As the Hawaii Supreme Court stated in *Alamida*, the doctrine of subrogation is "broad enough to include every instance in which one party pays a debt for which another is primarily answerable and which in equity and good conscience should have been discharged by the latter." 53 Haw. at 403, 495 P.2d at 589. It most certainly should apply here. Equity regards D & Z as a surety for that portion of the debt that NPI should discharge, and, like a surety, D & Z is entitled to be subrogated to the extent it has paid more than its proportionate share of the debt. *Cf.* 83 C.J.S. *Subrogation* § 17, at 618–19 (1953 & Supp. 19). In this matter, since D & Z and NPI were jointly liable on the settlement agreement with the plaintiffs for $225,000.00, this

court *could* thus hold that NPI must pay D & Z one-half of the settlement amount, i.e., $112,500.00, under the above-stated principles of equitable subrogation.

■ Additional equitable considerations, however, require this court to modify that ratable amount from $112,500.00 to $50,000.00. Inasmuch as D & Z has sought equity, D & Z must do equity. At the settlement conference, NPI's attorney only offered $50,000 toward the settlement, and he was asked to seek an additional $25,000.00 from NPI. NPI later confirmed its position to D & Z that NPI would not contribute anything beyond the $50,000.00 originally offered. D & Z then proceeded to discharge the entire *common debt* of $225,000.00. This included the $50,000.00 that NPI had offered toward the settlement and was thereby incurred as a debt of NPI to the plaintiffs. Thus, as between the defendants there was an agreement that NPI would contribute no more than $50,000.00 and D & Z would contribute only $150,000.00, with the remaining $25,000.00, or even a greater amount, remaining a "bone of contention" for a later contribution trial. When D & Z paid off the entire debt, it paid off more than its proportionate share only to the extent of $50,000.00 *or* any greater amount of liability on NPI's part that D & Z could prove at the contribution trial.

The contribution trial failed to change the original proportions of the settlement agreement agreed to by the defendants. The jury did not establish that NPI was more than 22 and 2/9% at fault (which is $50,000.00 divided by $225,000.00). The jury did not establish that D & Z was more than 77 and 7/9% at fault (which is $175,000.00 divided by $225,000.00). Had that occurred, the original proportions of the defendants' debt to the plaintiffs would have changed. The jury found that neither party was at fault, and thus negated an alteration of the original apportionment of the debt acceptable to and *established* by the *defendants themselves* in the settlement negotiations.

3. Evangelista Affidavit, at 3 (passage quoted fully above).

Equity therefore requires that the status quo of NPI's offering $50,000.00 and D & Z's providing the balance of $175,000.00 must be maintained. D & Z was most desirous to "get a cap" on this litigation. NPI also wanted that "cap", but NPI indicated that it would not pay anything above $50,000.00 (22 and ²⁄₉%) to get it, and that it would litigate that issue with the plaintiffs, instead. Equity requires that the party who wished to hang tough and litigate should not be penalized for such position, a position that the jury, at the contribution trial, apparently confirmed. Equity requires that a party who is more anxious to put a "cap" on the litigation should be unable to force an unwilling codefendant to contribute more than it believed was reasonable to get that "cap" and settle the suit.

Again, 73 Am.Jur.2d *Subrogation* § 13, at 607 states, "[t]he various maxims of equity ... are brought into play when subrogation is sought." Here, principles of equitable estoppel and restitution support this court's conclusion that NPI pay $50,000.00 toward the settlement. In here applying equitable estoppel, D & Z understood that NPI had put $50,000.00 on the table and both parties acted in reliance on that common understanding. Regarding restitution, NPI incurred a debt to the extent of $50,000.00 or whatever other amount would be established at the contribution trial based on an apportionment of fault, i.e., greater or less than 22 and ²⁄₉%; D & Z incurred a debt on NPI's behalf only to that extent, as discussed above.

Thus, what equity's right hand provides under subrogation, that NPI could be liable for half of the settlement amount, i.e., $112,500.00, equity's left hand removes in part to satisfy other just considerations. Thus, equity's two hands require NPI to contribute $50,000.00 to the $225,000.00 settlement.

## B. CONCLUSION

Until the Hawaii Supreme Court takes another look at *Alamida* and, hopefully, corrects it, under *Alamida* D & Z may not recover as a joint tortfeasor under Haw. Rev.Stat. § 663–12.

Under the doctrine of subrogation, as modified and supported by other equitable considerations, D & Z is entitled to payment of $50,000.00 from NPI. Equity demands this result.

Each party shall bear its own costs.

IT IS SO ORDERED.

