30 P.3d 895

**BENEFICIAL HAWAII, INC., a Delaware corporation, Plaintiff–Appellee,**

v.

**Donald Muneo KIDA, Defendant–Appellant,**

**and**

**John Does 1–50; Jane Does 1–50; Doe Partnerships, Doe Corporations, Doe Entities and Doe Governmental Units 1–50, Defendants,**

**and**

**Donald Muneo Kida, Counterclaimant,**

v.

**Beneficial Hawaii, Inc., Counterclaim–Defendant.**

**Donald Muneo Kida, Third–Party Plaintiff,**

v.

**Michele Kobayashi fka Michele Umeno aka Michele Fukuda Umeno, individually and dba R.M. Financial Associates; R & M Associates, Inc., a Hawaii Corporation, Financial M.D. Associates, Inc., a Hawaii Corporation, directly and dba The Mortgage Warehouse; Milburn**

---

Iwai dba Pacific Mortgage Funding Group; Pacific Mortgage Funding Group, Ltd.; a Hawaii Corporation; Elaine F. Naito; UK Holding Corporation dba Equity Funding Group; JOHN DOES 1–10; Jane Does 1–10; Doe Corporations 1–10; Doe Partnerships 1–10; Doe Mortgage Corporations 1–5; Doe Financial Corporations 1–5; Doe Principal Mortgage Brokers 1–5; Doe Governmental Entities 1–10, Third–Party Defendants.

No. 22420.

Supreme Court of Hawai'i.

Aug. 31, 2001.

Shelby Anne Floyd, Jade Lynne Ching, and David A. Fisher (of Alston Hunt Floyd & Ing), on the briefs, Honolulu, for the plaintiff-appellee Beneficial Hawaii.

Junsuke Otsuka (of Shigemura & Harakal), on the briefs, for the defendant-appellant Donald M. Kida.

MOON, C.J., and LEVINSON, and NAKAYAMA, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Donald Muneo Kida appeals from the judgment and decree of foreclosure of the first circuit court, the Honorable Marie N. Milks presiding, filed on March 15, 1999, in favor of the plaintiff-appellee Beneficial Hawaii, Inc. Kida argues that the circuit court erred in: (1) failing to invalidate an alleged mortgage (the mortgage) on a property located at 2532 Booth Road, in the City and County of Honolulu (the property), and an alleged note (the note), secured by the mortgage, inasmuch as the note and mortgage were (a) void and unenforceable pursuant to Hawai'i Revised Statutes (HRS) § 454–8 (1993),[1] (b) forged

---

1. HRS § 454–8 provides: **"Penalty, contracts void.** Violation of this chapter shall be punisha-

and/or altered, (c) executed in favor of an unregistered partnership, The Mortgage Warehouse, which did not have a legal capacity to contract, and (d) unsupported by any consideration from The Mortgage Warehouse; (2) concluding that Kida ratified the note and mortgage, inasmuch as (a) an illegal contract may not be ratified, (b) Kida did not know all material facts and did not have an opportunity to return the benefits received on account of the note; (3) finding that Kida's purported agent, who drafted the note and mortgage in his name, acted within the scope of her alleged authority, inasmuch as her actions were (a) not customary in the lending industry and (b) illegal; (4) finding that the note was validly (a) assigned from The Mortgage Warehouse to Novus Financial Corporation and from Novus Financial Corporation to Beneficial Mortgage Corporation and (b) transferred from Beneficial Mortgage Corporation to Beneficial Hawaii; (5) concluding that Beneficial Hawaii was entitled to enforce the note, inasmuch as (a) the endorsements requisite to conferring upon Beneficial Hawaii the status of a holder of the note within the meaning of HRS ch. 490 (Uniform Commercial Code) were not supplied until after the present action had commenced and (b) there was no evidence that the note was in the possession of or negotiated to Novus Financial Corporation, Beneficial Hawaii's predecessor in the chain of ownership; and (6) applying the doctrine of equitable subrogation to find Kida liable to Beneficial Hawaii upon the note and mortgage, inasmuch as (a) Beneficial Hawaii did not plead an equitable subrogation claim, (b) Beneficial Hawaii did not exhaust its legal remedies, (c) Beneficial Hawaii did not advance any money to benefit Kida, (d) the entity that originally advanced funds to satisfy an agreement to sell the property, which appeared to have been either Novus Financial Corporation or Novus Credit Services, did not pay to protect its own interest, (e) an equitable subrogation claim is barred by the doctrine of unclean hands, (f) the funds advanced pursuant to the note did not satisfy a prior encumbrance on the property, and (g) the doctrine of equitable subrogation may not be the basis of a foreclosure decree absent a prior decree of equitable subrogation and Kida's default under such a decree.

We hold that the note and mortgage were void and unenforceable pursuant to HRS § 454–8. Accordingly, we do not reach Kida's points of error regarding the formation of the loan contract, his purported ratification of the loan, and Beneficial Hawaii's right to enforce the note and mortgage. We

ble by a fine of not more than $1,000 or imprisonment of not more than one year, or both. *Any contract entered into by any person with any unlicensed mortgage broker or solicitor shall be void and unenforceable.*" (Emphasis added.)

HRS § 454–1 (1993) provides that a " '[m]ortgage broker' means a person not exempt under section 454–2 who for compensation or gain, or in the expectation of compensation or gain, either directly or indirectly makes, negotiates, acquires, or offers to make, negotiate, or acquire a mortgage loan on behalf of a borrower seeking a mortgage loan."

During the period relevant to the present matter, HRS § 454–2 (1993) exempted from the operation of HRS ch. 454 the following entities:

(1) Banks, trust companies, building and loan associations, pension trusts, credit unions, insurance companies, financial services loan companies, or federally licensed small business investment companies, authorized under any law of this State or of the United States to do business in the State;

(2) A person making or acquiring a mortgage loan with one's own funds for one's own investment without intent to resell the mortgage loan;

(3) A person licensed to practice law in the State, not actively and principally engaged in the business of negotiating loans secured by real property, when the person renders services in the course of the person's practice as an attorney;

(4) A person licensed as a real estate broker or salesperson in the State, not actively engaged in the business of negotiating loans secured by real property, when the person renders services in the course of the person's practice as a real estate broker or salesperson;

(5) An institutional investor negotiating, entering into, or performing under a loan purchase agreement for its portfolio, for subsequent resale to other institutional investors, or for placement of the mortgages into pools or packaging them into mortgage-backed securities. As used in this paragraph "loan purchase agreement" means an agreement or arrangement under which a bank, savings and loan, credit union, financial services loan company, or other financial institution registered to do business in the State of Hawaii agrees to sell mortgage loans or obtain funding therefor, with or without the transfer of servicing rights, to an institutional investor.

further hold that the circuit court erred in applying the doctrine of equitable subrogation to the present matter. Inasmuch as Beneficial Hawaii failed to adduce evidence sufficient to prove that it was entitled to any equitable relief, we reverse the circuit court's judgment and decree of foreclosure in favor of Beneficial Hawaii, filed on March 15, 1999.

## I. BACKGROUND

### A. Procedural History

In a complaint filed on December 2, 1996, Beneficial Hawaii alleged (1) that Kida was the owner of the property, (2) that, on July 11, 1994, Kida had mortgaged the property to The Mortgage Warehouse to secure repayment of a $300,000.00 loan pursuant to a note signed by Kida, (3) that, through several mesne assignments, Beneficial Hawaii had become the owner of the note and mortgage, and (4) that Kida had defaulted on the loan and owed $294,296.10 of principal, plus accrued interest and late charges. Beneficial Hawaii prayed for a foreclosure sale of the property, the proceeds thereof to be used to satisfy Kida's alleged obligations under the note.

In his answer, filed on January 16, 1997, Kida admitted his ownership of the property as of October 9, 1996 but denied signing either the note or the mortgage and, therefore, any liability for payment of the sums allegedly due under the note. At the same time, Kida filed a counterclaim against Beneficial Hawaii and a third-party complaint against defendants Michele Kobayashi, R & M Associates, Inc., Financial M.D. Associates, Inc., Milburn Iwai, Pacific Mortgage Funding Group Ltd., Elaine Naito, and UK Holding Corporation. Kida alleged in the counterclaim, inter alia, that Kobayashi had forged his signature on the loan documents,

wrongfully obtained and/or diverted the loan proceeds, and concealed the existence of the loan by making some of the payments required under the note and retaining all correspondence concerning the mortgage. In his third-party complaint, Kida alleged, inter alia, (1) that Kobayashi's license as a mortgage broker was terminated on February 12, 1992, (2) that, pursuant to a consent judgment, filed in the first circuit court on July 18, 1994 and reiterated in a consent judgment filed in the first circuit court on November 24, 1995, Kobayashi and her agents, officers, servants, and employees were enjoined from providing any services for which a mortgage broker's license was required, (3) that Kobayashi was an officer, director, employee, and/or agent of Financial M.D. Associates, which was doing business as The Mortgage Warehouse and was not licensed to act as a mortgage broker, and (4) that, on July 11, 1994, Kobayashi made, negotiated, or acquired the mortgage on Kida's behalf. Kida sought relief, inter alia, for fraud and misrepresentation, breach of fiduciary duty, unfair and deceptive trade practices, violations of HRS ch. 454 ("Mortgage Brokers and Solicitors"), see supra note 1, negligence, and conspiracy.[2]

On February 25, 1997, Beneficial Hawaii answered Kida's counterclaim and cross-claimed against Kobayashi, R & M Associates, Financial M.D. Associates, Iwai, Pacific Mortgage Funding Group, Naito, and UK Holding for indemnification. On March 3, 1997, Iwai and Pacific Mortgage Funding Group filed an answer and a cross-claim against Kobayashi, R & M Associates, Financial M.D. Associates, Naito, and UK Holding for indemnification and/or contribution. On May 29, 1998, the parties filed a stipulation to dismiss Kida's third-party complaint and other parties' cross-claims against UK Hold-

---

**2.** In his third-party complaint, Kida also alleged that, on December 17, 1995, Kobayashi drafted, negotiated, or acquired a mortgage loan from Countrywide Financing Company in the amount of $212,000.00 that was secured by Kida's home, located at 2526 Booth Road, which is a property adjacent to the property at issue in the present appeal. Kida further alleged that he was not aware of and did not authorize the transaction, that his signatures on the loan documents were forged, and that the proceeds from the transac-

tion were wrongfully obtained and/or diverted by Kobayashi. On June 8, 1998, the circuit court entered an order severing all claims with regard to the property located at 2526 Booth Road from the present matter and consolidating them with another action pending before the circuit court. Kida's statement of related cases indicates that that case, as well as several other cases currently pending before the first circuit court, implicate the financing scheme at issue in the present appeal.

ing. On July 29, 1998, Kida filed a motion to dismiss his claims against Iwai and Pacific Mortgage Funding Group pursuant to a settlement reached among the parties; the circuit court granted the motion by order entered on November 23, 1998.

A bench trial in the present matter commenced on August 25, 1998. On September 3, 1998, following the evidentiary portion of the trial, the parties placed stipulations on the record regarding dismissal of (1) Kida's counterclaim against Beneficial Hawaii, (2) Beneficial Hawaii's cross-claim against Kobayashi and her entities, R & M Associates and Financial M.D. Associates, (3) Beneficial Hawaii's cross-claim against Iwai and Naito, and (4) Iwai and Pacific Mortgage Funding Group's cross-claim against Kobayashi, R & M Associates, and Financial M.D. Associates. The following stipulations to dismiss were ultimately filed on the dates listed: (1) November 12, 1998—stipulation to dismiss Kida's third party complaint and Iwai and Pacific Mortgage Funding Group's cross-claim against Kobayashi, R & M Associates, and Financial M.D. Associates; (2) November 18, 1998—stipulation to dismiss Kida's counterclaim against Beneficial Hawaii; (3) December 3, 1998—stipulation to dismiss Beneficial Hawaii's cross-claim against Kobayashi, R & M Associates, and Financial M.D. Associates; and (4) December 21, 1998—stipulation to dismiss Kida's third-party complaint and Iwai and Pacific Mortgage Funding Group's cross-claim against Naito. Following these stipulations, the only claim effectively remaining in the present matter was Beneficial Hawaii's original claim against Kida.[3]

### B. Trial Testimony

#### 1. Beneficial Hawaii's case

##### a. Michele Kobayashi

At trial, Michele Kobayashi testified that she had had a "personal intimate relationship" with Kida between 1989 and 1995 and that she had intermittently cohabited with Kida at 2526 Booth Road between 1989 and 1991. She testified that she had purchased the property at issue in the present matter jointly with Kida by way of an agreement of sale (the agreement) between her company, R & M Associates, and Kida, as purchasers, and Thelma Choy, as the seller, for the price of $400,000.00. Kida advanced $150,000.00 as a cash down payment upon the signing of the agreement. According to Kobayshi's testimony, Kida had suggested that they purchase the property.

Kobayashi further testified that she and Kida had discussed the manner of paying off the agreement of sale. and that Kida had directed her "to take care of it." Kobayashi asserted that she had informed Kida that The Mortgage Warehouse would pay off the agreement of sale through a loan arranged by her in Kida's name. According to Kobayashi, Kida did not object. Kobayashi testified that Kida provided her with various documents she needed for the loan application, including bank statements of Kida's business, K. Kida Fishing Supplies, Kida's personal bank statements, documents pertaining to Kida's two prior divorces, copies of Kida's tax returns for 1991 and 1992, Kida's driver's license, and the general excise tax license for Kida's business, all of which were introduced into evidence as exhibits.

Regarding the loan documents, Kobayashi testified that, in approximately May 1994, Kida had signed, in her presence, a promissory note for $300,000.00 in favor of The Mortgage Warehouse, as well as a mortgage on the property securing the note. Kobayashi stated that these documents "had become stale," inasmuch the loan had not been funded within thirty days of the first mortgage payment date specified in the documents; therefore, new documents were required in order to comply with "the guidelines of the lender". However, Kobayashi was uncertain as to what "the lender's" precise requirements had been. Kobayashi testified that The Mortgage Warehouse was a partnership between her and Jerry McGarvey, which was

---

**3.** No stipulation has been filed regarding the dismissal of Beneficial Hawaii's cross-claims against Iwai, Pacific Mortgage Funding Group, and Naito. However, inasmuch as these cross-claims were for contribution and/or indemnification, they are moot in view of Kida's dismissal of his counterclaim against Beneficial Hawaii.

involved in financing mortgage loans. On cross-examination, Kobayashi testified that she had personally delivered the paperwork to the Department of Commerce and Consumer Affairs in order to register The Mortgage Warehouse as a Hawai'i general partnership but had not obtained a certificate of registration. She also testified that The Mortgage Warehouse had an office in California but not in Hawai'i. On recross examination, Kobayashi testified that The Mortgage Warehouse was a trade name of Financial M.D. Associates.

On approximately July 25, 1994, without Kida's knowledge, Kobayashi assembled a new set of loan documents by replacing the first page of the note and signing Kida's name on the mortgage and other documents sent to her from California. Kobayashi maintained that she was authorized by Kida to sign the documents pursuant to a power of attorney that Kida had executed; however, she was unable to produce the power of attorney, and it had not been recorded. The original loan documents that Kida had signed had been discarded.

Kobayashi testified that, prior to July 29, 1994, the agreement of sale had been paid off with the proceeds of the loan. The closing statement for the transaction, dated July 29, 1994, identified Kida as the borrower and his address as that of Kobayashi's company, Financial M.D. Associates. The lender was identified as The Mortgage Warehouse and the payoff amount as $269,400.00. Kobayashi testified that she had been the loan broker involved in the transaction, but, upon further questioning, she stated that Financial M.D. Associates had actually been the broker, as identified in the closing statement. The mortgage agreement, dated July 25, 1994, identified Kida as the mortgagor and his address as that of the property. The Mortgage Warehouse was identified in the mortgage statement as the mortgagee, the address of Financial M.D. Associates being the mortgagee's address, although a California address was designated as the mailing address. Through Kobayashi, Beneficial Hawaii introduced an assignment agreement, dated May 25, 1994, and recorded on July 29, 1994, by which R & M Associates purported to assign its interest in the property to Kida, into evidence.

Kobayashi testified, in spite of the assignment agreement, that she had retained an interest in the property due to her relationship with Kida. Kobayashi further testified on direct examination that Kida had informed her of telephone calls from a commercial entity, styled "Novus," regarding collection of the loan at some time between 1994 and 1996. Kida had not, however, indicated that he believed that she, Kobayashi, was the borrower on the loan, nor had he accused her of forgery until the time of the present lawsuit.

On cross-examination, Kobayashi testified that, in 1991, Kida and she intended to merge the property with that of Kida's residence and develop the combined property in anticipation of their retirement. She testified that she and Kida had cohabited until 1993. Kobayashi testified that Kida had negotiated the agreement of sale with Thelma Choy without her participation and that she had not realized that she was a personal guarantor of the agreement. She further testified that, after Choy had vacated the property, her company—R & M Associates—had made payments to Choy under the agreement. Kobayashi admitted that her mortgage broker's license had expired in 1992, but asserted that, at that point, she had formed Financial M.D. Associates, which was a licensed mortgage broker in 1994. She asserted that any broker's fees received by her or "R.M. Financial," which was her trade name, from the closing of Kida's loan "would have been payable to Financial M.D. Associates," but was uncertain whether a check payable to R.M. Financial had been issued by the escrow company as part of the closing of the loan. Neither R.M. Financial nor The Mortgage Warehouse was a licensed mortgage broker in Hawai'i.

Kobayashi further testified on cross-examination that she had not informed anyone about the power of attorney, purportedly signed by Kida in 1992, or about the fact that she had written Kida's name on the loan application and closing documents. The power of attorney was purportedly notarized at Kobayashi's behest. Both Kobayashi and

her mother, Elaine Naito, were notaries. Although Kobayashi claimed to have regarded herself as Kida's mortgage broker in connection with the loan transaction, she had not informed Kida of that fact or disclosed to him that either she or Financial M.D. Associates would receive a fee or commission when the loan closed. Without Kida's knowledge, Kobayashi had opened an escrow account to handle the loan.

Admitting that she signed the mortgage agreement in Kida's name, Kobayashi testified that the signature had been notarized by "her notary." In this connection, Kobayashi testified that it was her mother's practice to notarize Kida's signature even if he had not signed the document in question in her presence. Kobayashi explained that the July 1994 transfer of R & M Associates' interest in the property to Kida had been effected because the loan had been approved as an "owner occupant residential loan," which was subject to a lower interest rate than was an investment loan. R & M Associates, as a corporation, did not qualify for such a loan. Kida had personally signed the assignment agreement.

On redirect examination, Beneficial Hawaii attempted to establish the precise identity of the mortgage broker for Kida's loan. Kobayashi stated that The Mortgage Warehouse was the lender and broker. She explained that The Mortgage Warehouse was licensed as a "wholesale broker" in California and had acted as such in the present transaction, which was actually funded by Novus Financial.

### b. *Margaret Meyer*

Margaret Meyer, who, as an officer of the escrow company—TI of Hawaii—in 1994, handled the escrow involved in the closing of the agreement of sale between Kida and Choy. Meyer testified that Kobayashi opened the escrow on behalf of The Mortgage Warehouse. According to the escrow records, the proceeds of the loan from The Mortgage Warehouse to Kida—principal in the amount of $269,400.00 and interest in the amount of $3,906.30—were disbursed to Choy, and the balance was utilized to pay various closing costs. Four documents were recorded simultaneously as a result of the closing of the loan: (1) the assignment agreement between R & M Associates and Kida; (2) the mortgage; (3) the deed in satisfaction of the agreement of sale; and (4) the assignment of the mortgage from The Mortgage Warehouse to Novus Financial. Based on the procedures utilized in the closing of the loan, Meyer characterized The Mortgage Warehouse as both the lender and the broker, but also stated that "[t]echnically, Financial MD [Associates] was the mortgage broker."

### c. *Novus Financial*

Through an officer of Novus Financial, Barbara Scherschligt, Beneficial Hawaii introduced Novus Financial's records of its efforts to collect on the loan into evidence. The records reflect that an application for Kida's loan was pending in July 1994, at which time Novus Financial required new loan documents because the originals had "expired" before the loan could be funded.

On July 29, 1994, Novus Financial sent a "welcome" letter to Kida at 2526 Booth Road, advising him that his "Warehouse Mortgage loan" had been "transferred" to Novus Financial. Novus Financial placed its first collection call to Kida on September 16, 1994. According to Novus Financial's records, Kida told a loan collection officer that "his bookkeeper" was paying the loan and provided the collection officer with the telephone number of Kobayashi's office. The collection officer was unable to reach Kobayashi, and Kida promised to check with her to make sure that a payment was received by September 19, 1994. Novus Financial called Kida again on September 20, 1994. Kida advised Novus Financial to contact Kobayashi; Kobayashi, in turn, promised to forward two payments via an overnight carrier.

A total of approximately forty-four collection calls from Novus Financial to Kida ensued between September 1994 and January 1996. Scherschligt quoted some of the collection officers' comments, all of which reflected that Kida was referring the collection efforts to Kobayashi, variously denominated as his "bookkeeper," "accountant," "CPA," "property manager," or "broker." Although Kida was insisting that payments either had

been made or would be made imminently, the payments were not made as promised. The collection officers informed Kida that the loan was his obligation, not Kobayashi's, that he was responsible for paying it, and that the delinquencies would affect his credit. According to Novus Financial's records, Kida acknowledged the collection officers' assertions but continued to rely on Kobayashi to make the payments.

The collection officers described Kida as uncooperative, nonchalant, and unconcerned. Although they advised Kida that it was not their responsibility to call Kobayashi, they did attempt to contact her when Kida asked them to do so. They were usually unable to reach her, but on the two or three occasions when they did succeed in speaking with her, the collection officers' comments indicated that Kobayashi had been terse with them, had insisted that the payments had been made, and had hung up the telephone.

In December 1995, Kida advised the collection officers that he was refinancing the loan through Kobayashi and that the loan would soon be paid off. Nevertheless, neither Kida nor Kobayashi requested Novus Financial to quantify the payoff figure.

In January 1996, two payments were made on the loan, and the account became current. On March 31, 1996, Novus Financial sold the loan to Beneficial Mortgage. The loan file, including the note and an assignment of the mortgage, was transferred to Beneficial Mortgage on April 30, 1996.

### d. Barbara Renquinha

Barbara Renquinha, one of Beneficial Hawaii's managers, testified that Beneficial Hawaii owned the note and mortgage at issue in the present matter. The note and mortgage were dated July 11, 1994 and reflected that the original lender had been The Mortgage Warehouse, that the mortgage had been recorded on July 29, 1994, and that the note had been assigned from The Mortgage Warehouse to Novus Financial, which assigned it to Beneficial Mortgage, which assigned it to Beneficial Hawaii. The loan documents were transferred from Beneficial Mortgage to Beneficial Hawaii in August 1996, and the assignment was recorded on October 8, 1996.

Renquinha testified that, beginning on May 24, 1996, Beneficial Mortgage had sent Kida several collection letters, including, on June 4, 1996, a notice of intent to foreclose. In a letter dated July 16, 1996, Beneficial Mortgage informed Kida that Beneficial Hawaii would be servicing his loan commencing on August 15, 1996.

Renquinha was familiar with Kobayashi as a Beneficial Hawaii broker since the time that Renquinha had transferred to Hawai'i in 1994 from another of Beneficial's offices. At Beneficial's request, she had contacted Kobayashi regarding the loan several times before Beneficial's collection efforts were transferred to Hawai'i. Thus, on July 26, 1996, Renquinha had telephoned Kobayashi to request that she appear at Beneficial Hawaii's office in order to execute a check in the amount of $2,300.00 that had been received unsigned from Kobayashi. On August 8, 1996, Kobayashi contacted Beneficial Mortgage and stated that she would be in touch with Renquinha. Beneficial Mortgage sought Renquinha's assistance, and Renquinha telephoned Kobayashi to request payment.

Renquinha had her first contact with Kida on August 15, 1996, when he telephoned to ask for copies of two mortgage documents, one of which was the mortgage at issue in the present matter.

On August 21, 1996, Kobayashi telephoned Renquinha, who explained to Kobayashi that she needed $5,606.00 to eliminate the loan's delinquency. Kobayashi stated that she had several mortgage closings scheduled and ought to have the requested funds available by August 27, 1996. Following her conversation with Kobayashi, Renquinha telephoned Karen Arakawa of Island Title, an escrow company, to arrange to have Kobayashi's commissions assigned to Beneficial Hawaii.

Renquinha's next contact with Kida was on August 29, 1996, when she telephoned to inform him that he owed her company over half a million dollars on two loans, that he was delinquent in his payments, that there had been numerous broken promises to pay, and that Kobayashi was not a signatory to either of the loans. According to Renquinha,

Kida stated that Kobayashi was paying his mortgage. Renquinha informed Kida that she had learned from Kobayashi that Kobayashi had been trying to obtain a mortgage to pay off the loans. Kida agreed to speak with Kobayashi and to advise Renquinha of the outcome of the conversation.

The next day, August 30, 1996, Renquinha telephoned Kida once more. Kida stated that Kobayashi would make a payment by the end of the day, but no payment was tendered to Beneficial Hawaii. Renquinha informed Kida that Beneficial Hawaii was commencing a foreclosure action against the two properties that were securing his loans. Renquinha noted that Kida did not seem to her to be concerned. She asked Kida why Kobayashi was making his loans payments, to which Kida responded that Kobayashi had promised to do so.

Renquinha testified that, on September 10, 1996, Gary Yonamine, Beneficial Hawaii's senior manager, had personally visited Kida at his store. Yonamine informed Kida that a payment of $2,226.00 was required at that time and that a foreclosure proceeding was imminent. Kida promised to confer with Kobayashi. Yonamine informed Kida that Beneficial Hawaii wished to work with Kida directly without the involvement of any third parties. On October 16, 1996, Beneficial Hawaii's attorneys sent Kida a notice of default and a demand for payment, both by registered and first class mail, identifying November 18, 1996 as the deadline for payment.

Renquinha testified that, according to Beneficial Hawaii's records, Kida telephoned Yonamine on October 23, 1996 in order to inquire whether Kobayashi had made payment. Yonamine apprised Kida that Kida's attorney did not wish Beneficial Hawaii to communicate with Kida. Kida insisted that he wished to discuss the situation because he was concerned about the demand letter that he had received from Beneficial Hawaii's attorneys, notwithstanding that, on his attorney's advice, he had not accepted the copy sent by registered mail. Yonamine advised Kida that Beneficial Hawaii had received a payment in the amount of $2,803.40, which, however, was insufficient to bring the loan into good standing. Yonamine telephoned Kida on November 14, 1994 to inquire whether any further payments would be forthcoming. Kida returned the call the next day to state that he would check with Kobayashi about the payments.

2. *Kida's case*

Kida testified at trial that, in 1989, he and Kobayashi had begun to spend time together regularly. Kobayashi was staying at Kida's residence when she visited Oʻahu from Maui, where she was residing and working as a real estate broker and developer. In 1990, Kobayashi moved to Oʻahu and lived part of the time with Kida, but never stayed with him on a regular basis. At about that time, Kida discussed with Choy the possibility of his purchase of her property. However, Choy's asking price of $400,000.00 was too high for Kida to afford. Kida mentioned the situation to Kobayashi, who suggested that, if he would pay half the price, then she would pay the other half and build a house on the property.

In early 1992, Kida signed an agreement of sale for the property and paid $200,000.00 as his share of the arrangement. The paperwork was prepared by Choy's attorney. Kida testified that he did not read the document or fully understand it. His understanding of the agreement was that his responsibility was limited to the payment of the $200,000.00 and that the rest was Kobayashi's responsibility. He did not know, and was not concerned about, any payments that remained due under the agreement of sale. Choy continued living on the property until the early part of 1993, when she moved to a retirement facility.

By the end of 1992, Kobayashi was no longer living with Kida. In December of that year, Kida met his present wife, who moved in with him within the same month. Kida did not see Kobayashi again until March 1994, when she began to occupy an office near his store. Kobayashi occasionally delivered lunches or desserts to Kida. Kida reciprocated by providing parking spaces for her in his parking lot.

Kida testified that, at one point, he turned over his driver's and general excise tax li-

censes to Kobayashi in order for her to withdraw $5,000.00, which he had agreed to lend her, from his "time certificate" account. Kobayashi remained in possession of the licences for part of the morning. Kida repeatedly denied authorizing Kobayashi to sign his name on any documents or to obtain a mortgage loan in his name. Kida testified that he had not authorized anyone to sign his name either in 1992 or 1994 and had not signed any papers that would have authorized anyone to sign his name. He did not apply for any loan or borrow any money during that time period. He denied signing any of the numerous loan application papers, generated in 1993 and 1994, which were in evidence, such as federal truth in lending disclosure statements, a request for taxpayer identification number, a uniform residential loan application, an estimate of settlement charges, and a Fannie Mae affidavit and agreement, all of which bore his apparent signature and some of which were notarized.

Kida insisted that he had not seen any of the loan documents in 1994 and that he had not received any of the legal notices pertaining to the loan. Kida testified that he had not heard of The Mortgage Warehouse in May 1994 and that he had never had any dealings with it. Kobayashi did not ask Kida to assist her in borrowing any money or in paying off the agreement of sale. Kida did not pay any expenses related to the maintenance of the property, such as utilities or taxes, and did not obtain insurance for the property, because his understanding was that Kobayashi was responsible for that.

Kida testified that he had never given Kobayashi any of the personal and business records and documents that supported the loan application, which Beneficial Hawaii had introduced into evidence. On cross-examination, Kida admitted that he had previously testified in his deposition that he had given some of the bank statements at issue to Kobayashi. However, he explained on redirect examination that his deposition testimony had been based on the erroneous assumption, when unexpectedly confronted with copies of the documents, that he *must* have given them to Kobayashi.

Kida testified that he maintained his personal and business records, including the documents at issue, boxed in a warehouse that was adjacent to his store. In 1994, he had permitted Kobayashi to use the warehouse to store various items, including boxes, bags, and furniture. Kobayashi had access to the warehouse through the store, and Kida had instructed his employees to allow Kobayashi access when he was not in the store. Kida stated that the boxes in which he kept his records were taped, but that he had discovered, after giving his deposition, that the tape had been loosened, suggesting that it had been removed and later replaced.

Kida admitted that, in 1995, Kobayashi had requested copies of his personal income tax forms and divorce papers in connection with what Kida understood to be her attempts to refinance "her Novus loan" with Countrywide Finance and that he had instructed his accountant and attorney, respectively, to release the documents to her. Kobayashi had allegedly represented to Kida that Countrywide Finance required the documents, inasmuch as Kida was the sole owner of the property after R & M Associates' assignment of its interest to Kida.

Kida also admitted that he had signed the assignment agreement between himself and R & M Associates on May 25, 1994. However, he denied signing the note, the mortgage agreement, and an adjustable rate rider. According to Kida, Kobayashi had never told him that he was the borrower with respect to the loan.

Regarding Novus Financial's collection calls, Kida admitted to having spoken with collection officers in 1994 and the early part of 1995. However, his recollection of those conversations differed in many respects from the accounts recorded by the collection officers. Kida denied affirmatively representing to the collection officers that Kobayashi was his "accountant," "bookkeeper," or "CPA." He insisted that it was the collection officers who had inquired of him whether Kobayashi had acted in the foregoing capacities when he had earlier directed them to call Kobayashi as to all inquiries regarding the loan. He maintained that he had acquiesced in the suggested characterizations because he was

embarrassed to refer to Kobayashi as an "ex-girlfriend" or "ex-lover." Kida further explained that he had not protested when the collection officers had taken the position that the loan was his responsibility because he had believed that Kobayashi "was in trouble" at the time and he did not want to complicate matters by appearing confrontational. Therefore, he had attempted to refer the collection officers to Kobayashi so that she could resolve the matters directly with them. He also testified to being confused, inasmuch as Kobayashi had told him that the loan was hers, that she did not know why they were calling him, and that "those guys on the mainland don't really know what's going on."

Kida claimed to have adopted the strategy of deflecting Novus Financial's demands with a "yeah" and to have limited his involvement to relaying "messages" between Novus Financial and Kobayashi. Kida recalled that Kobayashi typically asserted that she had made the payments and that the collection officers typically asserted that Novus Financial had not received them. Kida acknowledged that the collection officers had been suggesting that he make the payments himself but denied stating that he would do so. Kida also denied having been advised by the collection officers that it had not been their responsibility to contact Kobayashi. He asserted that they had only complained that Kobayashi was not responding to their calls. Kida denied having received the July 29, 1994 "welcome" letter from Novus Financial.

Kida further testified that he had not been aware that R & M Financial Associates had made several payments, reflected in Novus Financial's records, on the loan between September 1994 and January 1995. Kida did admit, however, to making a series of payments to Novus Financial from his personal bank account between February and July 1995. Kida explained that it had been his understanding that Kobayashi was experiencing financial difficulties during that period of time and that he had drawn the checks in the amounts that she had directed in order to help her. Kida also testified that, during the same period of time, Kobayashi had presented him with a sports car in response to his complaint that she had not been repaying

him for the payments that he had made for her. However, the car later turned out to have been leased and was repossessed. Kida claimed to have been unaware that R & M Financial Associates had resumed payments on the loan in September 1995 and that, from November 1995 through April 1996, payments were being made to Novus Financial from a bank account in which he and Kobayashi were joint tenants. Kida professed to be unaware that he had a joint account with Kobayashi until his attorney discovered it in October 1996.

Kida did not recall most of the collection calls, reflected in Novus Financial's records, spanning the period from September 1995 through April 1996. However, he acknowledged that, relying on information received from Kobayashi, he had represented to the collection officers in December 1995 that the loan was about to be refinanced. He denied stating that he had signed any papers in connection with the purported refinancing, but testified that he might have mentioned in the telephone conversations that a lot of paperwork had been involved, which had been what Kobayashi had told him.

Kida denied, or did not recall, receiving any of the various collection letters from Beneficial Mortgage. Kida testified that he had begun to receive collection phone calls from "Beneficial" but did not remember when he had received the first one. Kida initially referred the callers to Kobayashi in the same manner as he had with respect to the callers from Novus Financial. However, on August 8, 1996, the caller referred to two loans for which Kida was responsible, one secured by a mortgage on the property at issue in this appeal and another secured by Kida's home. Kida testified to having been "shocked." Although Kobayashi had assured him that there was only one loan, he no longer trusted her because, during the period in question, she had moved to a smaller office, had lost employees, and had not returned his calls promptly.

Kida remembered Renquinha as being his contact person regarding the loan but denied providing her a fax number by which to obtain copies of his mortgage agreements. He did not recall his alleged telephone con-

versations with Renquinha to which she had earlier testified. However, he recalled his personal meeting with Yonamine, after which he sought his attorneys' help in investigating the matter. Kida denied contacting Yonamine on October 23, 1996 but testified that Yonamine had telephoned him on that day; in the course of the conversation, he had told Yonamine that, on his attorney's advice, he had refused to accept certified mail. Kida claimed not to have communicated directly with Beneficial Hawaii after October 1996.

Kida testified that, in October 1996, he, his attorney, Kobayashi, and her husband had met in her office and that, during the course of the meeting, Kobayashi had admitted to having forged Kida's signature on the loan papers. Kida denied signing, or having authorized Kobayashi to sign, a warranty deed, dated February 1, 1996 and recorded on February 29, 1996, which purported to transfer half of the interest in the property to R & M Associates.

In addition to his own testimony, Kida adduced that of Laurie Levi, who was a friend of Kobayashi's family and was employed by Kobayashi between August 1993 and August 1995. Levi testified that Kobayashi's business had been denominated R.M. Financial, Financial M.D. Associates, or R & M Associates. Levi also regarded herself as working for The Mortgage Warehouse. She considered of all these organizations to be mortgage brokers. She also testified that Kobayashi was engaged in originating mortgage loans. Kobayashi had explained to Levi in 1994 that, by originating mortgage loans and processing them through The Mortgage Warehouse, she had been able to "get paid, quote, unquote, on the back end and get money from both sides." Levi testified that The Mortgage Warehouse had been the broker for Kida's loan. On cross-examination, Levi stated that Kobayashi had brokered Kida's loan and that Novus Financial had funded the loan. However, she reiterated that The Mortgage Warehouse had brokered the loan, that it had no funds of its own to lend, and that it had received compensation for its brokerage service. She described the arrangement involved in the transaction as "table funding."

### 3. Beneficial Hawaii's rebuttal

In rebuttal, Beneficial Hawaii offered the testimony of Howard C. Rile as an expert witness in the area of forensic document examination. Rile testified that, of nineteen signatures appearing on Kida's loan documents, eighteen were not in Kida's handwriting and that the only signature actually written by Kida was that appearing on the promissory note. He also opined, based on his analysis of the paper comprising the three-page note, that the first two pages of the note were composed of a different type of paper than that bearing the signature.

### C. Circuit Court's Ruling

On October 30, 1998, the circuit court filed its findings of fact and conclusions of law. The circuit court found: (1) that "Kida instructed Kobayashi to take care of procuring the loan"; (2) that, in May 1994, "Kida and Kobayashi made, executed and delivered [a note and mortgage] to The Mortgage Warehouse," which, however, "had become stale" and that, on or about July 11, 1994, Kobayashi had "replaced the first two pages of the May 1994 note with two newly drawn pages and signed Kida's name to new mortgage documents"; (3) that, "prior to the satisfaction of the agreement of sale[,] Kobayashi transferred her interest in the subject property to Kida"; (4) that, upon satisfaction of the agreement of sale, Kida was responsible for repayment of the indebtedness represented by the note; (5) that Novus had informed Kida of his obligation under the loan but that Kida had failed to disavow the note and mortgage; (6) that Kida had referred to Kobayashi as his "bookkeeper" and had stated that "she pays my mortgage"; (7) that Kida had provided Kobayashi with documents to effect a refinancing of the loan; (8) that Beneficial Mortgage and Beneficial Hawaii had informed Kida that the loan was his obligation to repay and Kida had failed to object; and (9) that the note had been assigned by a chain of assignments from The Mortgage Warehouse to Beneficial Hawaii. *Id.*

Based upon the foregoing findings of fact, the circuit court concluded: (1) that Benefi-

cial Hawaii was entitled to enforce the note as a holder; (2) that Kida was liable upon the note and mortgage as "a person who is represented by an agent or representative who signs the instrument," inasmuch as Kobayashi had acted pursuant to Kida's implied authorization, as evidenced by his instruction to Kobayashi "to take care of the purchase of the subject property on their behalf" and the fact that he had released documents to Kobayashi for the procurement of a loan; (3) that, even if Kida had not authorized Kobayashi to act as his agent, he had ratified her actions by retaining the benefits of the transaction and failing to disavow the loan; and (4) that, irrespective of the validity of the note and mortgage, Kida was liable to Beneficial Hawaii under the doctrine of equitable subrogation, inasmuch as the funds from the loan proceeds were used to satisfy a "prior encumbrance" upon the property created by the agreement of sale. The circuit court thus ruled that, inasmuch as the loan was in default, Beneficial Hawaii had a right to foreclose upon the property.

On March 15, 1999, the circuit court entered supplemental findings of fact and conclusions of law, in which it determined that Kida owed Beneficial Hawaii $359,022.60 on the loan and directed that final judgment be entered pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 54(b). On the same day, the circuit court entered a decree of foreclosure and an order of sale, as well as a judgment in favor of Beneficial Hawaii and against Kida, which "expressly direct[ed] that said judgment and decree of foreclosure be entered as final judgments pursuant to [HRCP] Rule 54(b)."

On April 12, 1999, Kida filed a timely notice of appeal.

## II. *STANDARDS OF REVIEW*

■ We review a trial court's [findings of fact] under the clearly erroneous standard.

"A [finding of fact] is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *State v. Kane*, 87 Ha-

wai'i 71, 74, 951 P.2d 934, 937 (1998) (quoting *Aickin v. Ocean View Investments Co.*, 84 Hawai'i 447, 453, 935 P.2d 992, 998 (1997) (quoting *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994))). [A finding of fact] is also clearly erroneous when "the record lacks substantial evidence to support the finding." *Alejado v. City and County of Honolulu*, 89 Hawai'i 221, 225, 971 P.2d 310, 314 (App.1998) (quoting *Nishitani v. Baker*, 82 Hawai'i 281, 287, 921 P.2d 1182, 1188 (App.1996)). *See also State v. Okumura*, 78 Hawai'i 383, 392, 894 P.2d 80, 89 (1995). "We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Roxas v. Marcos*, 89 Hawai'i 91, 116, 969 P.2d 1209, 1234 (1998) (quoting *Kawamata Farms v. United Agri Products*, 86 Hawai'i 214, 253, 948 P.2d 1055, 1094 (1997) (quoting *Takayama v. Kaiser Found. Hosp.*, 82 Hawai'i 486, 495, 923 P.2d 903, 912 (1996) (citation, some internal quotation marks, and original brackets omitted))).

*[State v.] Kotis*, 91 Hawai'i [319,] 328, 984 P.2d [78,] 87 (1999) (footnote omitted) (brackets in original).

Hawai'i appellate courts review conclusions of law *de novo*, under the right/wrong standard. *See Associates Fin. Services Co. of Hawaii, Inc. [v. Mijo]*, 87 Hawai'i [19] at 28, 950 P.2d [1219] at 1228. "Under the right/wrong standard, this court 'examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it.'" *Estate of Marcos*, 88 Hawai'i at 153, 963 P.2d at 1129 (citation omitted).

*Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transportation Co., Inc.*, 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999).

*Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (some brackets added and some in original).

■ "The interpretation of a statute is a question of law reviewable *de novo*." *Flor v.*

*Holguin,* 93 Hawai'i 245, 251, 999 P.2d 843, 849 (2000) (quoting *State v. Arceo,* 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996)) (brackets and ellipsis points omitted).

### III. *DISCUSSION*

A. *The Note And Mortgage Are Void And Unenforceable Pursuant To HRS § 454–8.*

In its findings of fact and conclusions of law, the circuit court did not expressly address Kida's claim that the note and mortgage at issue in the present matter were void and unenforceable pursuant to HRS § 454–8, *see supra* note 1. Kida's argument was, and remains on appeal, that the note and mortgage are contracts with an unlicensed mortgage broker—The Mortgage Warehouse—and, therefore, are subject to the sanctions prescribed in HRS § 454–8. The circuit court appears to have maintained the view that it expressed in its oral ruling denying Kida's motion for directed verdict at the close of Kida's case, *i.e.,* that The Mortgage Warehouse was the "lender" and that Financial M.D. Associates was the "broker" in the transaction at issue, inasmuch as they were so designated in the loan documents. If such was the circuit court's view, however, it was clearly erroneous in light of the evidence adduced at trial.

The record is uncontroverted that Kobayashi, with or without Kida's authorization, transmitted the loan application papers in Kida's name to her partner in The Mortgage Warehouse, who arranged with Novus Financial for the funding of the loan through an arrangement known in the lending industry as "table funding"—*i.e.,* The Mortgage Warehouse used funds provided by Novus Financial to close the loan and appeared as the nominal "lender" in the loan documents, but never owned the loan, inasmuch as it immediately assigned it to Novus Financial.[4] Kobayashi herself testified that The Mortgage

Warehouse was a "broker," as well as a "lender," in the transaction, although she also denominated herself and Financial M.D. Associates as having brokered the loan. Moreover, she admitted that the loan had been funded by Novus Financial. Meyer, who handled the closing of the loan as the escrow agent, considered The Mortgage Warehouse to be both the broker and the lender, although she acknowledged that Financial M.D. Associates was "technically" the broker. Levi, who was Kobayashi's employee during the relevant period, confirmed Kobayashi's testimony that The Mortgage Warehouse was a broker of the loan, that Kobayashi had brokered the loan, and that the loan had been funded by Novus Financial. Levi's testimony reflects that R.M. Financial, Financial M.D. Associates, R & M Financial, and The Mortgage Warehouse were all names that Kobayashi utilized in conducting her business as a mortgage broker. She stated that The Mortgage Warehouse had no funds of its own to lend but that it had been compensated for services rendered in the transaction, which she expressly described as being "table funded." As we have stated, the foregoing trial testimony is completely uncontradicted.

The loan having been table funded by The Mortgage Warehouse, the issue to be decided is whether The Mortgage Warehouse acted as a "mortgage broker" in the transaction within the meaning of HRS § 454–8, *see supra* note 1. The legislature enacted HRS ch. 454 ("Mortgage Brokers and Solicitors") as a consumer protection measure intended to "safeguard the public interest with respect to mortgage brokerage activities," there having "been frequent abuses in mortgage brokerage activities, particularly through telephone solicitation" and "[e]xorbitant and hidden charges hav[ing] been extracted from unwary consumers."

---

4. Table funded transactions are described in, *e.g., Reagan v. Racal Mortgage, Inc.,* 135 F.3d 37, 38 (1st Cir.1998); *Chandler v. Norwest Bank Minnesota, N.A.,* 137 F.3d 1053, 1056 (8th Cir.1998); *Culpepper v. Inland Mortgage Corp.,* 132 F.3d 692, 694–95 (11th Cir.1998); *Dubose v. First Sec. Sav. Bank,* 974 F.Supp. 1426, 1427 (M.D.Ala. 1997); *Noel v. Fleet Finance, Inc.,* 971 F.Supp. 1102, 1106 (E.D.Mich.1997); *Smith v. First Fam-*

*ily Fin. Serv., Inc.,* 626 So.2d 1266, 1269 (Ala. 1993); and *Reagan v. Racal Mortgage, Inc.,* 715 A.2d 925, 926 (Me.1998). Under the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601–2617, "table funding" means "a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds." 24 C.F.R. § 3500.2(b).

Hse. Stand. Comm. Rep. No. 3, in 1967 House Journal, at 492. In recommending that an amended version of the bill be enacted, the Senate Committee on Ways and Means stated as follows:

> The purpose of this bill is to provide for licensing and regulation of persons engaged in the business of mortgage brokers and mortgage solicitors by negotiating or offering to negotiate mortgage loans on real property.
>
> Testimony considered by your Committee indicates that the abuses in this area stem from fly-by-night operators who promise to secure mortgage loan financing, usually charge excessive fees, and often fail to produce results and disappear with advance fees paid.
>
> Your Committee has determined that there are a number of institutions and individuals whose broad business activities may be encompassed by the definition of "mortgage broker" contained in Sec. 2(c) of this bill.[5] Therefore, your Committee has

given careful consideration to the matter of exemptions and has concluded that protection of the public can best be achieved by exempting only those businesses which are already licensed and adequately regulated under other State and Federal laws[.]

Sen. Stand. Comm. Rep. No. 897, in 1967 Senate Journal, at 1244.[6]

■ We first observe that HRS ch. 454 is a consumer protection statute, which, therefore, must be interpreted broadly in order to effectuate its remedial purposes.[7] *See Hawaii Community Federal Credit Union v. Keka*, 94 Hawai'i 213, 229, 11 P.3d 1, 17 (2000).

■ In interpreting a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose.

---

**5.** The definition of "mortgage broker" set forth in the original version of HRS § 454–1 provided:

> "Mortgage Broker" means a person not exempt under section 454–2 who for compensation or gain, or in the expectation of compensation or gain, either directly or indirectly makes, negotiates, acquires, or sells or offers to make, negotiate, acquire, or sell a mortgage loan, but excluding transactions involving the sale or purchase of notes or bonds secured by mortgages under chapter 485.

HRS § 454–1(3) (1985). The legislature amended the foregoing definition in 1989 to yield the current definition quoted *supra* in note 1. In doing so, the legislature intended to "clarify" the definition of "mortgage broker." Hse. Stand. Comm. Rep. No. 1150, in 1989 House Journal, at 1255. The Senate Committee on Consumer Protection and Commerce emphasized that "[t]he purpose of this bill is to clarify the law regarding mortgage brokers and solicitors in accordance with recommendations made by the Legislative Auditor." Sen. Stand. Comm. Rep. No. 826, in 1989 Senate Journal, at 1116. The Auditor's report included a recommendation to "[c]larify that the regulation of mortgage brokers covers the brokers' activities in relationship to borrowers and not to investors." Legislative Auditor of the State of Hawai'i, *Sunset Evaluation Report, Regulation of Mortgage Brokers and Solicitors*, Report No. 88–21 (1988), at 23.

**6.** Quoting portions of the foregoing excerpts from the legislative history of HRS ch. 454, the dissenting opinion asserts that the legislature's

intent in enacting the statute was "to protect consumers from 'exorbitant' fees and 'hidden charges.' " Dissenting opinion at 3–5. However, it is equally evident that the legislation was intended to serve the broad remedial goal of preventing the full range of abuses by any person or organization involved in the mortgage brokerage business, including the barring of mortgage brokers from collecting excessive or unearned commissions or fees. It is precisely for this reason that the legislature adopted the broad definition of "mortgage broker" contained in HRS § 454–1, *see supra* note 1, which, as the dissent concedes, encompasses The Mortgage Warehouse as a maker of Kida's loan.

**7.** Of course, HRS ch. 454 is not limited in its application to "consumer" mortgage loans, inasmuch as the definition of "mortgage loan" set forth in HRS § 454–1 (1993) extends to any "loan secured by a mortgage on real property." However, the legislative history of the statute clearly evinces the legislature's preoccupation with consumer protection in enacting the statute. We note that the dissent's narrow interpretation of the statute, in spite of its acknowledgment of the statute's remedial purposes, is inconsistent with the principle of statutory construction stated in the dissent's own text. There is nothing in the statute to suggest that the phrase "any contract," as it appears in HRS § 454–8, should be narrowly interpreted to mean "a mortgage brokerage contract" as characterized by the dissenting opinion at footnote 2.

*Gray v. Administrative Dir. of the Court*, 84 Hawai'i 138, 148, 931 P.2d 580, 590 (1997) (quoting *State v. Toyomura*, 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995) (citations omitted)). The language of HRS § 454–1 defining "mortgage broker" is extremely broad and clearly encompasses more than simply a "middleman," whose role is limited to advising the borrower regarding available borrowing options, assisting the borrower in completing application papers, and overseeing the closing of loans. The statutory definition extends to any "person ... who for compensation or gain, ... either directly or indirectly makes, negotiates, or acquires ... a mortgage loan on behalf of a borrower...."

■ The statute does not define the expression "to make a mortgage loan," but, in interpreting analogous consumer protection statutes in the context of table funded transactions, other courts have held that "a loan is 'made' by the named creditor, even when the funds are actually provided by a third party." *See, e.g., Reagan v. Racal Mortgage, Inc.*, 135 F.3d 37, 41 & 41 n. 6 (1st Cir.1998) (noting that Maine Bureau of Consumer Credit Protection had ruled that "a company is considered to have 'made' a loan, if its name appears on the loan documents, even when the documents are immediately assigned to another lender. Therefore, a broker in Maine who engages in 'table-funded' loans must be licensed as a lender") (brackets omitted). In our view, the foregoing interpretation is consistent with the common usage of the term.

The legislature has limited the applicability of its broad definition of "mortgage broker" by exempting from the operation of the statute (1) institutional mortgage lenders regulated by other laws, (2) individuals making or acquiring a mortgage loan with their own funds for their own investment, and (3) licensed lawyers and real estate brokers. *See* HRS § 454–2, *supra* note 1. It is undisputed that none of the foregoing exceptions applies to The Mortgage Warehouse, inasmuch as the evidence adduced at trial has established that it was not licensed or even registered as a business entity in Hawai'i.

■ Beneficial Hawaii argues, however, that the phrase "on behalf of a borrower seeking a mortgage loan," inserted into the statutory definition of "mortgage broker" in 1989, *see supra* note 1, suggests that organizations such as The Mortgage Warehouse that do not "represent" the borrower are excluded from the definition.

When there is doubt, doubleness of meaning, or indistinctiveness or uncertainty of an expression used in a statute, an ambiguity exists.

In construing an ambiguous statute, "[t]he meaning of the ambiguous words may be sought by examining the context, with which the ambiguous words, phrases, and sentences may be compared, in order to ascertain their true meaning." HRS § 1–15(1) (1993). Moreover, the courts may resort to extrinsic aids in determining the legislative intent. One avenue is the use of legislative history as an interpretive tool. *Toyomura*, 80 Hawai'i at 18–19, 904 P.2d at 903–04 (citations and internal quotation signals omitted) (some brackets in original, some added, and some omitted). *See also Lara v. Tanaka*, 83 Hawai'i 24, 26–27, 924 P.2d 192, 194–95 (1996). "Furthermore, the legislature is presumed not to intend an absurd result, and legislation will be construed to avoid, if possible, inconsistency, contradiction, and illogicality." *State v. Griffin*, 83 Hawai'i 105, 108 n. 4, 924 P.2d 1211, 1214 n. 4 (1996) (quoting *State v. Malufau*, 80 Hawai'i 126, 137, 906 P.2d 612, 623 (1995) (citations and internal quotation marks omitted)) (brackets and internal quotation marks omitted). *See also* HRS § 1–15(3) (1993) ("Every construction which leads to an absurdity shall be rejected.").

*Gray*, 84 Hawai'i at 148, 931 P.2d at 590 (some brackets and ellipsis points omitted).

■ Although the plain meaning of the expression "to make a mortgage loan" may be clear, the expression "to make a mortgage loan on behalf of a borrower" requires interpretation. As discussed *supra* in note 5, the legislature inserted the language "on behalf of the borrower" to "clarify" that the statute did not apply to brokers' con-

tracts with investors, including the suppliers of funds used to make the loan. For the same reason, the legislature omitted the word "sell" from the definition, inasmuch as the statute was not intended to regulate mortgage transactions on the secondary market. *See supra* notes 1 and 5. Thus, the legislature undertook to "clarify" that the statute was intended to regulate the relationships between brokers and the borrowers on whose behalf the brokers acted and not the relationships between brokers and third parties. On the other hand, the amended definition of "mortgage broker" set forth in HRS § 454–1 continued to include all persons engaging in transactions with a borrower in connection with the making of a mortgage loan. Accordingly, we construe the phrase "on behalf of a borrower," as set forth in HRS § 454–1, as amended, to mean "in the interest of a borrower" or "for the benefit of a borrower." The construction suggested by Beneficial Hawaii—*i.e.,* that "on behalf of the borrower" means "acting for the borrower" or "in the name of the borrower"—would render the statutory terms "make" and "acquire" surplusage, thereby violating the fundamental canon of statutory construction that "courts are bound to give effect to all parts of a statute, and that no clause, sentence, or word shall be construed as superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *In re Doe,* 90 Hawai'i 246, 250, 978 P.2d 684, 688 (1999) (quoting *State v. Kaakimaka,* 84 Hawai'i 280, 289–90, 933 P.2d 617, 626–27 (1997)). Furthermore, most of the detailed exemptions enumerated in HRS § 454–2, *see supra* note 1, would be unnecessary if "mortgage broker" merely meant a person acting "for" or "in the name of" a borrower to locate and negotiate mortgage financing. In particular, HRS § 454–2(2) (exempting "[a] person making or acquiring a mortgage loan with one's own funds for one's own investment without intent to resell the mortgage loan") would be entirely superfluous. "Laws *in pari materia,* or upon the

same subject matter, shall be construed with reference to each other. What is clear in one statute may be called in aid to explain what is doubtful in another." HRS § 1–16 (1993).

 Beneficial Hawaii argues that HRS § 454–8, *see supra* note 1, does not apply to all contracts between a mortgage broker and a borrower, but, rather, only to "brokerage contracts," the statute's object being to preclude unlicensed brokers from claiming brokerage fees from borrowers. Beneficial Hawaii points out that the legislative history of the statute suggests that, in enacting HRS ch. 454, the legislature was motivated by concerns regarding abusive mortgage brokerage activities resulting in excessive brokerage charges. However, by its terms, the statute invalidates "*[a]ny* contract entered into by *any* person with *any* unlicensed mortgage broker." (Emphases added.) "Departure from the literal construction of a statute is justified only if such a construction yields an absurd and unjust result obviously inconsistent with the purposes and policies of the statute." *Shin v. McLaughlin,* 89 Hawai'i 1, 4, 967 P.2d 1059, 1062 (1998) (quoting *Alvarez v. Liberty House, Inc.,* 85 Hawai'i 275, 278, 942 P.2d 539, 542 (1997)).

 We agree that a hyperliteral construction of HRS § 454–8 would yield an absurd result, inasmuch as a contract wholly unrelated to mortgage brokerage activity, notwithstanding that a party to the contract is an unlicensed mortgage broker, is obviously beyond the intended scope of the statute. Accordingly, HRS § 454–8 must be interpreted to invalidate only those contracts into which unlicensed mortgage brokers enter in their capacity as mortgage brokers within the meaning of HRS § 454–1. However, any more restrictive construction of the term "contract" in HRS § 454–8 is unwarranted. If the legislature merely intended to invalidate the recovery of unlicensed brokerage commissions, it would not have needed to render the entire contracts themselves "void and unenforceable." [8]

---

8. The dissent takes issue with our holding that the term "contract," as employed in HRS § 454–8, means all contracts into which mortgage brokers enter in their capacity as mortgage brokers

on three grounds. First, it asserts that our holding "renders HRS § 454–8 inconsistent with the rest of HRS chapter 454." Dissenting opinion at 319, 30 P.3d at 925. Calling HRS § 454–3(a)

Beneficial Hawaii urges that the fact, without more, that a party to a transaction is unlicensed, in violation of a licensing statute, does not, in and of itself, render the entire transaction illegal and therefore void, citing *Wilson v. Kealakekua Ranch, Ltd.*, 57 Haw. 124, 130–32, 551 P.2d 525, 529–30 (1976)

(holding that architect's violation of licensing statute did not render contract to perform architectural services void and unenforceable, inasmuch as statute, which provided for penal sanctions but was silent with respect to enforceability of contracts of its violators, could not be interpreted as intending forfei-

"the key provision of HRS chapter 454," the dissent appears to be arguing that the section's significance is limited to disallowing unlicensed mortgage brokers from receiving compensation for their services. *See* dissenting opinion at 317–18, 319, 30 P.3d at 923–924, 925. It is true that a person does not violate HRS § 454-3(a) if the person does not receive, or expect to receive, compensation for his activities. It is equally true that a violation of HRS § 454-3(a) necessarily entails engaging in certain enumerated activities related to mortgage loans. The dissent's arguments merely emphasizes the compensation aspect of the proscriptions of HRS § 454-3(a). In any event, the "inconsistency" between HRS § 454-3(a) and our interpretation of HRS § 454-8 perceived by the dissent is that we do not expressly set forth a requirement that a contract void under HRS § 454-8 be "entered into" by an unlicensed mortgage broker for compensation or gain. However, such a requirement is implied by our holding, inasmuch as acting "in their capacity as mortgage brokers within the meaning of HRS § 454-1" means acting "for compensation or gain, or in the expectation of compensation or gain." On the other hand, further restricting the meaning of HRS § 454-8 to contracts "executed for the purpose of employing a broker," as suggested by the dissent, *see* dissenting opinion at 318 n.2, 30 P.3d at 924 n.2, would effectively subsume HRS § 454-8 within HRS § 454-3(a), making the former largely superfluous. As noted *supra*, we have repeatedly rejected statutory constructions that render any "clause, sentence, or word ... superfluous, void, or insignificant if a construction can be legitimately found which will give force to and preserve all words of the statute." *State v. Young*, 93 Hawai'i 224, 236 n. 6, 999 P.2d 230, 242 n. 6 (2000) (citations omitted). Second, the dissent suggests that our holding provides an incentive to consumers to use unlicensed mortgage brokers contrary to the legislative purpose of discouraging such use. The dissent's reasoning is premised upon the assumption that a consumer employing an unlicensed mortgage broker may be able to avoid having to pay the mortgage, citing Kida as an example. In fact, our holding should have the effect of *curtailing*, rather than encouraging, unlicensed brokerage activities similar to those of The Mortgage Warehouse in the present matter because, as a matter of sound business practice, lenders, such as Novus and Beneficial, should rationally be motivated to assure that their broker is properly licensed. Because of the elaborate exemptions set forth in HRS § 454-2, our holding will not affect legiti-

mate mortgage lending activity in the state, but will merely curb the use of complex mortgage financing schemes, such as table funding, by unlicensed entities. We believe that the result is fully consistent with the legislature's intent in enacting HRS ch. 454, such schemes presenting special opportunities for abuse when applied to unsophisticated borrowers. Furthermore, our holding in no way suggests that borrowers could, through the use of an unlicensed broker, avoid the obligation to repay their loans. We have devoted section III.B *infra* to a discussion of equitable remedies available to a party unjustly facing a loss due to the invalidity of a mortgage loan made in violation of HRS ch. 454. Provided that public policy considerations do not preclude equitable relief and that the plaintiff proves its loss, unjust enrichment of the borrower should be prevented. It is only by virtue of Beneficial Hawaii's failure to establish a prima facie case in the circuit court of a right to an equitable remedy that it has been denied a recovery. Of course, our holding does not preclude some other plaintiff with an equitable claim from proceeding against Kida in a subsequent action. Finally, third, the dissent perceives the result reached in the present matter as absurd, inasmuch as it "punishes" a holder of a promissory note for the illegal activities of a mortgage broker. To the contrary, Beneficial Hawaii is not being "punished," but merely suffers the consequences of the apparent illegality surrounding the making of Kida's loan, which may not be limited to a violation of the mortgage broker licensing requirements but may also implicate the statute of frauds, *see* HRS § 656-1 (1993) ("No action shall be brought and maintained ... [u]pon any contract for the sale of lands, tenements, or hereditaments, or of any interest in or concerning them ... unless the promise, contract, or agreement, upon which the action is brought, or some memorandum or note thereof, is in writing, and is signed by the party to be charged therewith, or by some person thereunto by the party in writing lawfully authorized."), as well as the federal mortgage lending laws. To the extent that Beneficial Hawaii was an "innocent" holder of the note, it had a full opportunity to prove its status and obtain relief. *See infra* at 315, 30 P.3d at 921. But to the extent that it failed to discharge its duty to ensure that the loan it acquired complied with the requirements imposed by applicable law, it must suffer the consequences of its failure. Such a result is not absurd at all, but merely implements the legislature's legitimate public policy.

ture of fees for services, wholly out of proportion to the requirements of public policy, extent of harm, and moral quality of conduct of parties), *Kona Joint Venture I, Ltd. v. Covella*, 88 B.R. 285 (D.Haw.1988) (holding that, when neither real estate brokers' licensing statute nor its legislative history indicated that legislature intended unenforceability of unlicensed broker's commission agreement, broker was entitled to retain commission paid), and *United National Bank of Miami v. Airport Plaza Limited Partnership*, 537 So.2d 608, 610–11 (Fla.Ct. App.1989) (holding that, in action to enforce note and mortgage by mortgagee, which performed brokerage services as part of agreement with mortgagor, mortgagee's failure to obtain broker's license in violation of statute invalidating unlicensed person's contracts for commission did not render entire real estate transaction void). The *Wilson* court observed that "[t]he fact that in another professional licensing situation the legislature has explicitly provided for nonenforceability of contracts increases the possibility that, if the legislature had intended unenforceability here, it would have expressed such an intent." *Wilson*, 57 Haw. at 132, 551 P.2d at 530.

*Wilson, Kona Joint Venture*, and *United National Bank* reflect the principle that, under appropriate circumstances, the court will sever the illegal portion of a transaction and enforce the remainder. By way of illustration:

In *Hardcastle Pointe . Corp. v. Cohen*, 505 So.2d 1381 (Fla. 4th DCA 1987), it was held that a portion of a contract for real estate consulting services which required the performance of broker services by an unlicensed person was void. The court severed the illegal portion and enforced the remainder of the contract relating to site development and other nonbrokerage duties. Illegal brokerage services called for under the contract were found to be separate and distinct from the site development services.

Here, similarly, the illegal brokerage service portion of the contract does not go to the essence of the agreement—a multimillion dollar sale of real estate. If the broker service agreement is severed, the agreement for the sale of real estate is still wholly supported by valid legal consideration. *See Local No. 234 of United Ass'n of Journeymen v. Henley & Beckwith, Inc.*, 66 So.2d 818 (Fla.1953) (contract will be enforced where illegal portion does not go to essence of contract and where it is still supported by valid legal promises on both sides after illegal portion is eliminated); *Slusher v. Greenfield*, 488 So.2d 579 (Fla. 4th DCA 1986) (same). *See also Title & Trust Co. v. Parker*, 468 So.2d 520 (Fla. 1st DCA 1985) (court will give effect to valid contract terms and ignore invalid terms in order to carry out contract's essential purpose).

*United National Bank*, 537 So.2d at 610–11.

Thus, the general rule is that severance of an illegal provision of a contract is warranted and the lawful portion of the agreement is enforceable when the illegal provision is not central to the parties' agreement and the illegal provision does not involve serious moral turpitude, unless such a result is prohibited by statute. *See Baierl v. McTaggart*, 238 Wis.2d 555, 618 N.W.2d 754, 757 (Ct.App.2000); *In re Pacific Adventures, Inc.*, 5 F.Supp.2d 874, 882 (D.Haw.1998) (quoting *Ai v. Frank Huff Agency, Ltd.*, 61 Haw. 607, 619, 607 P.2d 1304, 1312 (1980) ("It is well settled under ordinary contract law, however, that a partially illegal contract may be upheld if the illegal portion is severable from the part which is legal.") (Citation omitted.)); Calamari & Perillo, *Contracts* § 22–5(d) (2d ed.1977).

The doctrine of severability is inapposite to the present matter, however, because the contract at issue is the loan agreement itself, which is not divisible. The fact is inescapable that The Mortgage Warehouse was an unlicensed mortgage broker within the meaning of HRS ch. 454 and that it "made" the loan on Kida's behalf, as proscribed by HRS § 454–1. We hold that the broad language of HRS § 454–8, which expressly invalidates "any contract entered into by any person with any unlicensed mortgage broker," read *in pari materia* with the definition of "mortgage broker" as set forth in HRS § 454–1, compels the conclusion that a

note and mortgage designating the broker as the creditor as a result of the broker's brokering activities falls within the proscription of HRS ch. 454. When a statute requiring a license declares void contracts "made" by an unlicensed person, the violation of the statute is a defense to enforcement of the instrument even against a holder in due course. *See Kedzie and 103rd Currency Exchange v. Hodge*, 156 Ill.2d 112, 189 Ill.Dec. 31, 619 N.E.2d 732, 736–38 (1993); *Rash v. Farley*, 91 Ky. 344, 15 S.W. 862 (1891).

■■■ Beneficial Hawaii concedes that notes and mortgages are contracts. *See Metropolitan Life Ins. Co. v. Strnad*, 255 Kan. 657, 876 P.2d 1362, 1365 (1994); *Federal Deposit Ins. Corp. v. Hennessee*, 966 F.2d 534, 537 (10th Cir.1992); *American Sav. & Loan Ass'n v. Blomquist*, 21 Utah 2d 289, 445 P.2d 1, 4 (1968); *Lincoln Nat. Life Ins. Co. v. Kelly*, 73 N.D. 622, 17 N.W.2d 906, 909 (1945). Assuming, as the circuit court found, that Kida authorized Kobayashi to sign the loan documents and/or ratified the transaction by his conduct, the note and mortgage at issue were nevertheless contracts to which The Mortgage Warehouse was a party. The record is uncontroverted that The Mortgage Warehouse procured the documents for compensation or gain by negotiating and making the mortgage loan on Kida's behalf. Accordingly, The Mortgage Warehouse was a "mortgage broker" within the meaning of HRS § 454–1. Inasmuch as The Mortgage Warehouse was an unlicensed entity, we hold that the contracts were void and unenforceable pursuant to HRS § 454–8. Beneficial Hawaii may not enforce the note and mortgage, even if the contracts were authorized and/or ratified by Kida and validly assigned to Beneficial Hawaii. Accordingly, we need not reach Kida's points of error regarding the formation of the loan contract and the assignment of the note and mortgage.

B. *Beneficial Hawaii Has Failed To Establish That It Is Entitled To Equitable Relief.*

Beneficial Hawaii argues in its answering brief that interpreting HRS § 454–8 so as to void the mortgage loan would lead to an unjust result, inasmuch as the borrower would be enriched at the expense of the holder of the loan instruments merely because the mortgage broker was an unlicensed one. It cannot be gainsaid that the unqualified cancellation of the invalid loan would enrich Kida. In fact, Kida concedes in his reply brief that a proper party may have equitable rights to recover the funds advanced on his behalf in satisfaction of the purchase agreement.

■■■ As a preliminary matter, we address Kida's argument that the circuit court did not have jurisdiction to grant Beneficial Hawaii equitable remedies when legal remedies were available.

> [T]he general principle [is] that equity will not take jurisdiction when the complainant has a complete and adequate remedy at law. That rule does not apply, however, and this is one of the exceptions, when the claim of the complainant is of an equitable nature and admits of a remedy in a court of equity only.

*Henry Waterhouse Trust Co. v. King*, 33 Haw. 1, 9 (1934). Mortgage foreclosure is a proceeding equitable in nature and is thus governed by the rules of equity. *See, e.g., Bank of Hawaii v. Horwoth*, 71 Haw. 204, 213 & 213 n. 9, 787 P.2d 674, 679–80 & 680 n. 9 (1990) (citing *Honolulu Plantation Co. v. Tsunoda*, 27 Haw. 835, 840 (1924); *Honolulu, Ltd. v. Blackwell*, 7 Haw.App. 210, 219, 750 P.2d 942, 948 (1988)) (noting that "[b]efore the adoption in 1952 of HRCP Rule 2 calling for 'one form of action to be known as "civil action"[,]' the statute authorizing foreclosures by action compelled such suits to be brought in equity") (some brackets added and some in original); *Bank of Hawaii v. Davis Radio Sales and Service, Inc.*, 6 Haw. App. 469, 480–81, 727 P.2d 419, 427 (1986).

> A complaint in equity is an appeal to the exercise of the equity court's sound discretion, *Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 430 P.2d 316 (1967). Equity jurisprudence is not bound by strict rules of law, but can mold its decree "to do justice," *id.*, and a court of equity, once having assumed jurisdiction, may retain the case to afford complete relief. *Tugaeff v. Tugaeff*, 42 Haw. 455 (1958).

*Id.* at 481, 727 P.2d at 427. *See also Forte v. Nolfi,* 25 Cal.App.3d 656, 692, 102 Cal.Rptr. 455, 479 (1972) (holding that when note and deed of trust were null and void and of no legal effect because of forgery, assignee of note and deed of trust, nevertheless, had equitable lien upon property for value of construction work for which note and deed of trust were given). Accordingly, the circuit court had the power to grant Beneficial Hawaii its requested relief, namely, a foreclosure sale to satisfy Kida's alleged indebtedness, on equitable grounds.

 Exhibiting instincts aimed in the right general direction, the circuit court in the present matter stated the following in its conclusions of law:

L. Irrespective of the validity of the note and mortgage, Kida is liable to Beneficial [Hawaii] under the Doctrine of Equitable Subrogation. Under the Doctrine of Equitable Subrogation, one who advances money to pay off an encumbrance with the express understanding that it is to be secured by a first lien on the property will be subrogated to the rights of the prior encumbrancer in the event that the new security is for any reason not a valid first lien on the property (unless superior or equal equities will be prejudiced). *Smith v. State Savings & Loan Assn.,* 175 Cal. App.3d 1092, 223 Cal.Rptr. 298 (1985); *[Rock River] Lumber Corp. v. Universal Mortgage Corp.,* [82 Wis.2d 235] 262 N.W.2d 114 (Wis.1978); *Peters v. Weatherwax,* 69 Haw. 21, 731 P.2d 157 (1987) (recognizing equitable subrogation); *Hawaiian Government v. Cartwright,* 8 Haw. 697 (1890); Restatement of Restitution, Section 162, cmt a (1937).

M. In the present case, the funds from the July 1994 loan satisfied the prior encumbrance under the Agreement of Sale. The July 1994 loan was understood to be secured by the mortgage, as a first lien on the property. Even if the July 1994 Mortgage were invalid, Beneficial [Hawaii] is entitled to Equitable Subrogation to the position of the prior encumbrance that was satisfied by the loan proceeds. Thus, Beneficial [Hawaii] is entitled to Equitable Subrogation to the position of the encumbrancer under the Agreement of Sale.

Although the circuit court accurately described the doctrine of equitable subrogation, the doctrine does not fit this case because the agreement of sale did not create the kind of "encumbrance" upon the property in favor of the seller, Choy, to whose rights Beneficial Hawaii could be "subrogated." In accordance with the agreement of sale, "title" to the property remained in the seller. *See Horwoth,* 71 Haw. at 211–12, 787 P.2d at 678–79; *Jenkins v. Wise,* 58 Haw. 592, 596, 574 P.2d 1337, 1340–41 (1978). In this context, the seller's interest is sometimes described as "a lien serving as security for the payment of the purchase price." *See Horwoth,* 71 Haw. at 211–12, 787 P.2d at 679. However, the "lien, like every other equitable lien, is not an interest *in the land* . . . but [is] merely an encumbrance." *Id.* at 212 n. 8, 787 P.2d at 679 n. 8 (emphasis in original) (quoting 2 J. Pomeroy, *Equity Jurisprudence* § 386, at 24 (5th ed.1941)).

 Accordingly, this court has described the outer limits of the doctrine of equitable subrogation as follows:

Subrogation is a venerable creature of equity jurisprudence, "so administered as to secure real and essential justice without regard to form[.]" H. Sheldon, *The Law of Subrogation* § 1, at 2 (1882) (footnote omitted). "It is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which, in equity and good conscience, should have been discharged by the latter[.]" *Id.* (footnote omitted). It "is defined by Sheldon to be 'the substitution of another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt.'" *Kapena v. Kaleleonalani,* 6 Haw. 579, 583 (1885). When subrogation occurs, "[t]he substitute is put in all respects in the place of the party to whose rights he is subrogated.' *Id.* In effect, he "steps into the shoes" of the party. *See Putnam v. Commissioner,* 352 U.S. 82, 85, 77 S.Ct. 175, 176, 1 L.Ed.2d 144 (1956); A. Windt, *Insurance Claims and Disputes* § 10.05, at 409

(1982); *Black's Law Dictionary* 1279 (5th ed.1979).

*Peters*, 69 Haw. at 27, 731 P.2d at 161–62 (brackets in original).

■■■ Inasmuch as an agreement of sale "is an executory contract which binds the vendor to sell and the vendee to buy the realty which constitutes the subject matter of the transaction," *Jenkins*, 58 Haw. at 596, 574 P.2d at 1340, The Mortgage Warehouse and/or Novus Financial may be viewed as having paid Kida's "debt" in the sense of having satisfied his obligation under the agreement of sale.[9] The fact remains, however, that Choy was not Kida's "creditor"; rather, she was the other party to the agreement of sale, whose performance—*i.e.*, conveyance of title to Kida—had not yet occurred.

■■■ In *Jenkins*, we described the rights of the parties to an agreement of sale as follows:

Under an agreement of sale, the legal title to the property remains in the seller, but upon the execution and delivery of the agreement of sale, there accrues to the vendee an equitable interest in the land. *Cf. Hofgaard & Co. v. Smith*, 30 Haw. 882 (1929). The purchaser becomes vested with the equitable and beneficial ownership of the property, *Kresse v. Ryerson*, 64 Ariz. 291, 169 P.2d 850 (1946), and unless the agreement provides otherwise, the vendee is entitled to its immediate possession. The legal title is retained by the vendor essentially as security for the payment by the vendee of the purchase price. *See S.R.A., Inc. v. Minnesota*, 327 U.S. 558, 66 S.Ct. 749, 90 L.Ed. 851 (1946). Additionally, and as a further assurance to the vendor that the purchaser will perform his end of the bargain, the agreement of sale generally provides for cancellation and forfeiture, at the vendor's option, upon default by the vendee in the payment of the purchase price.

Strict foreclosure pursuant to the provisions of an agreement of sale has the effect of divesting the purchaser of his equitable interest in the property, as well as any right he may have to recover any moneys he has paid on account of the purchase price.

*Id.* at 596–97, 574 P.2d at 1340–41.

■■ Prior to the satisfaction of the agreement of sale, Choy's remedies against Kida, in the event of the latter's failure to perform, were limited to (1) cancellation and retention of the monies that Kida had paid or (2) a decree of specific performance and damages. *See Jenkins*, 58 Haw. at 596–98, 574 P.2d at 1340–42. After satisfaction of the agreement of sale, Choy had no further rights against Kida. *S. Utsunomiya Enterprises, Inc. v. Moomuku Country Club*, 75 Haw. 480, 514, 866 P.2d 951, 968 (1994) (noting that "it has been long established under the doctrine of merger that, upon delivery and acceptance of the deed, the provisions of the underlying contract for conveyance are merged into the deed and thereby become extinguished and unenforceable") (citations omitted). Accordingly, Beneficial Hawaii's "stepping into [Choy's] shoes" could not confer upon it the right to foreclose upon the property, because Choy herself never possessed such a right.

■■ But equitable subrogation is not the only remedy available to prevent unjust enrichment. In *Small v. Badenhop*, 67 Haw. 626, 701 P.2d 647 (1985), we considered the plaintiffs' potential remedies in an action commenced against landowners who had acquired title to realty from them for nominal consideration in reliance upon representation, promises, and an agreement to jointly develop the property. With respect to general principles of restitution, we had the following to say:

---

9. "[A]n assignee assumes the assignor's equitable subrogation rights [pursuant to] the general rule ... that where a valid assignment of a mortgage has been consummated with proper consideration, the assignee is vested with all the powers and rights of the assignor." *Mort v. United States*, 86 F.3d 890, 894 (9th Cir.1996). Accord-ingly, assuming that the mortgage loan at issue in the present matter was validly assigned, with proper consideration, from The Mortgage Warehouse through the several mesne assignments to Beneficial Hawaii, the latter would have the equitable subrogation rights of the former.

Turning to the question of how injustice may best be averted here, we note the plaintiffs prayed for the imposition of a constructive trust. "A constructive trust is [one way] through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity [may convert] him into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.) (citations omitted) quoted in 5 A. Scott, *The Law of Trusts* § 462 (3d ed.1967). Still, the imposition of a trust may not be apt in the circumstances.

A party entitled to restitution may have in an appropriate situation one or more of the following remedies: (1) the use of self-help, (2) specific restitution of the subject matter, (3) the imposition of a constructive trust, (4) the enforcement of an equitable lien, (5) the subrogation of the party to the position of a prior claimant, or (6) an order for the payment of money by the person who received the benefit. *See Restatement of Restitution* § 4. We can summarily rule out all but the third and fourth remedies in the situation at hand.

We need not dwell on the first, second, fifth, and sixth alternatives, for they are obviously tailored to meet other situations. At first blush it appears the imposition of a trust through the entry of "a decree ... that the title or possession of the subject matter be transferred" to the plaintiffs may be proper. Yet, what we are seeking is a way "to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property." *Id.* § 160 comment d. The imposition of a constructive trust on the subject property would not have the desired effect. It would provide a remedy inconsistent with the fundamental precepts of restitution, for it would give the plaintiffs more than they had.

Restitution, however, may be accomplished "not only by ... compelling the surrender ... of property ..., but also by imposing an equitable lien upon the property in favor of the plaintiff." *Id.* § 161 comment a. *The Restatement* articulates of the pertinent principle in these terms:

> Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises.

*Id.* § 161. We think injustice could be prevented here by the establishment of a proper lien on the subject property. *See Coelho v. Fernandez*, 46 Haw. 578, 593, 384 P.2d 527, 535 (1963) (citing *King v. Thompson*, 34 U.S. (9 Pet. ) 204, 9 L.Ed. 102 (1835)).

*Id.* at 638–40, 701 P.2d at 655–56 (brackets and ellipsis points in original) (footnotes omitted). *See also In re 2003 and 2007 Ala Wai Blvd.*, 85 Hawai'i 398, 412, 944 P.2d 1341, 1355 (App.1997) ("An equitable lien is a claim for payment secured by real property not as a result of any agreement between the parties but because of the application of principles of equity and fairness." (Citing *Small.*)). Accordingly, the question arises whether Beneficial Hawaii has a right to any further proceedings in the circuit court to determine its entitlement to equitable remedies, such as an equitable lien, so as to prevent Kida's unjust enrichment. We hold that it does not.

■ At trial, Beneficial Hawaii failed to adduce any evidence that it had paid value for the note and mortgage it is attempting to enforce. Indeed, Beneficial Hawaii concedes on appeal that it "did not assert at trial that it was a holder in due course," but merely contended that "it was entitled to enforce the Note *and* that it was the holder of the Note." For that reason, the record is devoid of any evidence regarding consideration that Beneficial Mortgage may have given in acquiring the loan from Novus Financial. Thus, inasmuch as Beneficial Hawaii has expressly disavowed any claim to the status of "holder in due course" and "[r]estitution restores a person to the position he formerly occupied, either by the return of something which he formerly had or by the receipt of its equivalent in money," *Hong v. Kong,* 5 Haw.App.

174, 182, 683 P.2d 833, 841 (1984) (internal quotation marks and citation omitted), it is axiomatic that equitable relief is available to Beneficial Hawaii only to the extent that it has paid value for the right to enforce the note and mortgage. Any recovery in excess of that value "would provide a remedy inconsistent with the fundamental precepts of restitution, for it would give the plaintiffs more than they had." *Small*, 67 Haw. at 639, 701 P.2d at 656. Beneficial Hawaii's failure of proof in the foregoing regard is fatal to any claim of a right to equitable relief in the present action.

## IV. CONCLUSION

Based on the foregoing reasoning, we reverse the circuit court's judgment and decree of foreclosure in favor of Beneficial Hawaii, filed on March 15, 1999.

### Dissenting Opinion of RAMIL, J.

I respectfully dissent. The legislature enacted Hawai'i Revised Statutes (HRS) chapter 454 (1993 and Supp.2000) to protect consumers from excessive fees and hidden charges imposed by unscrupulous mortgage brokers. Accordingly, I would hold that section 454-8 (1993) renders void and unenforceable any mortgage brokerage contract between a consumer and an unlicensed mortgage broker. In this manner, section 454-8 is rendered consistent with the plain language and legislative history of HRS chapter 454. In my view, the majority's interpretation of section 454-8 is inconsistent with legislative intent and the plain language of HRS chapter 454, and produces an absurd result.

This court has long held that when interpreting a statute, our "primary duty" is to "ascertain the intention of the legislature and to implement that intention to the fullest degree." *Kaiama v. Aguilar*, 67 Haw. 549, 554, 696 P.2d 839 (1985). My disagreement with the majority stems from its efforts to ascertain the intent of the legislature in enacting HRS § 454-8, which contains two sentences and reads as follows:

> Violation of this chapter shall be punishable by a fine of not more than $1,000 or imprisonment of not more than one year, or both. Any contract entered into by any person with any unlicensed mortgage broker or solicitor shall be void and unenforceable.

A majority of this court—that I do not join—has expressed the view that "where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning." *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (citing *Citizens for Protection of North Kohala Coastline v. County of Hawai'i*, 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999)). The language employed in the second sentence of HRS § 454-8 is admittedly both plain and unambiguous. It is also absurdly broad. By its own terms, section 454-8 invalidates and renders unenforceable "any contract"—be it for long distance telephone service, an automobile lease, or employment—if one party to the contract is an "unlicensed mortgage broker or solicitor."

Departure from literal construction—even absent statutory ambiguity—is appropriate when such construction would produce an absurd and unjust result. *Franks v. City and County of Honolulu*, 74 Haw. 328, 341, 843 P.2d 668, 674 (1993) (citing *Hawaiian Ins. & Guar. Co. v. Financial Sec. Ins. Co.*, 72 Haw. 80, 807 P.2d 1256 (1991)). Accordingly, and as the majority concedes, a plain language construction of section 454-8—or, to use the majority's term, a "hyperliteral construction"—would yield an absurd result and must be rejected. *Id.*

To ascertain and implement the intent of the legislature, we must read the language of section 454-8 "in the context of the entire statute and construe it in a manner consistent with the purpose of the statute." *State v. Mezurashi*, 77 Hawai'i 94, 97, 881 P.2d 1240, 1243 (1994) (internal quotation marks and citations omitted). It is thus incumbent upon this court to ascertain the legislative purpose of HRS chapter 454 and construe section 454-8 in a manner consistent with that purpose. *Id.* Here, the legislature's intent is readily discernible from both legislative history and plain language.

Enacted in 1967, HRS chapter 454 was designed to "safeguard the public interest with respect to mortgage brokerage activi-

ties[.]" Hse. Stand. Comm. Rep. No. 3, in 1967 House Journal, at 492. Specifically, the legislature enacted HRS chapter 454 in response to concerns about "exorbitant" fees and "hidden charges" that were being "exacted from unwary consumers" by unscrupulous mortgage brokers. *Id.* The Senate Committee on Ways and Means remarked that "the abuses in this area stem from fly-by-night operators who ... usually charge excessive fees, and often fail to produce results and disappear with advance fees paid...." Sen. Stand. Comm. Rep. No. 897, in 1967 Senate Journal, at 1244.

In 1988, the legislative auditor, upon conducting a review of the effectiveness and efficiency of the statute, reported that the foregoing problems persisted. *See* Legislative Auditor of the State of Hawai'i, *Sunset Evaluation Report, Regulation of Mortgage Brokers and Solicitors,* Report No. 88–21 (1988), at 16. The auditor noted that consumer complaints against mortgage brokers between 1980 and 1988 alleged: 1) failure to service accounts before a lock-in rate expired; 2) deliberate lying and delays to charge a higher interest rate than originally quoted and promised; 3) misrepresentation; 4) false promises; 5) failure to disburse funds and create escrow accounts; 6) withholding of refundable monies; and 7) gross negligence. *Id.* Accordingly, the auditor recommended that the legislature reenact HRS chapter 454. *Id.* at 23. The auditor further recommended that the legislature "clarify that the regulation of mortgage brokers covers the brokers' activities in relationship to borrowers *and not to investors.*" *Id.* (emphasis added).

In accordance with the auditor's recommendation, the legislature, in 1989, reenacted HRS chapter 454. *See* 1989 Haw. Sess. L. Act 218, at 517. The legislature also amended the statutory definition of "mortgage broker" to clarify the legislature's intent that HRS chapter 454 regulate the relationship between the mortgage broker and the borrower. *See* Hse. Stand. Comm. Rep. No. 1150, in 1989 House Journal, at 1255; Sen. Stand. Comm. Rep. No. 826, in 1989 Senate Journal, at 1116.

This legislative intent—to protect consumers from "exorbitant" fees and "hidden charges"—is equally apparent from the structure and language of HRS chapter 454. Most dramatic is the fact that the statute does not preclude unlicensed "persons"— such as The Mortgage Warehouse, *see* HRS 454–1—from making, negotiating, or selling mortgage loans, but rather disallows them from receiving commissions, fees, or bonuses in connection with the making, negotiating, or selling of mortgage loans. HRS § 454–3(a) (1993).

The key provision of HRS chapter 454 is section 454–3(a), which instructs that:

> No person shall act as a mortgage broker or mortgage solicitor without a license therefor as provided in this chapter, and no person not licensed under this chapter shall charge or receive any commission, fee, or bonus in connection with arranging for, negotiating, or selling a mortgage loan.

A mortgage broker is a person who *"for compensation or gain, or in the expectation of compensation or gain,"* makes a mortgage loan on behalf of a borrower. HRS § 454–1 (1993) (emphasis added). By the statute's plain language, therefore, The Mortgage Warehouse was only a "mortgage broker" because it received "compensation or gain" from the transaction. *Id.* It is not, therefore, the fact that The Mortgage Warehouse was unlicensed that renders the "contract" in this case void and unenforceable, but rather the fact that The Mortgage Warehouse, while unlicensed, expected to receive, and did receive, several thousand dollars in lender's fees.

The foregoing language with respect to commissions, fees and bonuses is consistent with the remainder of HRS chapter 454 which unambiguously polices the relationship between mortgage brokers and consumers, and specifically brokers' commissions and fees. For example, HRS § 454–7 (1993) authorizes the commissioner to directly regulate brokerage fees:

> The commissioner may also adopt rules concerning maximum fees, commissions, and charges on mortgage loan transactions. The maximum fees, commissions, and charges shall be related to the actual

amount of money made available to the borrower, over and above the indebtedness of prior mortgages. The commissioner may also adopt rules concerning the full disclosure of the fees, commissions, and charges.

HRS chapter 454 also contains a list of conduct that may lead to the suspension of a mortgage brokerage license. *See* HRS § 454–4 (1993). Such conduct includes misrepresentation, the failure to disburse funds in accordance with an agreement, and the failure to place funds in escrow "within a reasonable time."[1] HRS § 454–4(a).

Based on the foregoing, I would interpret section 454–8 in a manner consistent with the purpose of HRS chapter 454 and hold that it renders void and unenforceable any ·mortgage brokerage contract between a consumer and an unlicensed mortgage broker.[2] With respect to the majority's conclusion that the term "contract," as employed in section 454–8, means all contracts which mortgage brokers enter into in their capacity as mortgage brokers, *see* Majority at 310, 30 P.3d at 916, I have three observations.

First, the majority ignores the longstanding principle that "laws in *pari materia,* or upon the same subject matter, shall be construed with reference to each other." *International Sav. and Loan Ass'n v. Wiig,* 82 Hawai'i 197, 200, 921 P.2d 117, 120 (1996) (citing *Richardson v. City and County of Honolulu,* 76 Hawai'i 46, 55, 868 P.2d 1193, 1202 (1994)). Specifically, the majority's expansive reading of the term "contract" renders section 454–8 inconsistent with the rest of HRS chapter 454. The statute, in HRS § 454–3(a), expressly disallows unlicensed persons—such as The Mortgage Warehouse—from obtaining commissions or fees in connection with making, acquiring or selling mortgage loans. In my view, section 454–8 is consistent with section 454–3(a) because it renders "void and unenforceable" mortgage brokerage contracts and thereby precludes unlicensed entities from enforcing such contracts and obtaining brokerage fees or commissions from consumers—which is precisely what section 454–3(a) disallowed The Mortgage Warehouse from doing. In this same manner, both HRS §§ 454–3(a) and 454–8 are consistent with the statutory definition of "mortgage broker" as a person who "for compensation or gain, or in the expectation of compensation or gain," makes, acquires or sells a mortgage loan on behalf of a buyer. HRS § 454–1. Pursuant to this definition, if, for example, The Mortgage Warehouse did not anticipate receiving fees or commissions from the transaction, it would not have been a "mortgage broker" or violated any provision of HRS chapter 454.

Second, the majority's conclusion is fundamentally inconsistent with the express purpose of HRS chapter 454. The legislature enacted HRS chapter 454 to *discourage* the use of unlicensed mortgage brokers. As stated *supra,* the legislature was expressly concerned about "exorbitant" fees, "hidden charges," and mortgage brokers who collect advance fees and then disappear. The majority, however, interprets section 454–8 to

---

1. HRS § 454–4 provides in relevant part as follows:

 **§ 454–4. Suspension, revocation.**

 (a) The commissioner may suspend a license for a period not exceeding two years for any of the following acts or conduct of a licensee:

 (1) Making a false promise tending to influence, persuade, or induce, or pursuing a course of misrepresentation or false promises through agents, solicitors, advertising, or otherwise;

 (2) Misrepresentation or concealment of any material fact with respect to any transaction resulting in injury to any party;

 (3) Failure to disburse funds in accordance with an agreement;

 (4) Failure to account or deliver to any person any personal property such as money, fund, deposit, check, draft, mortgage, or other document or thing of value which has come into the person's hands and which is not the person's property or which the person is not in law or equity entitled to retain, and at the time which has been agreed upon, or is required by law, or, in the absence of a fixed time, upon demand of the person entitled to the accounting or delivery;

 (5) Failure to place, within a reasonable time upon receipt, any money, fund, deposit, check, or draft ... in escrow pursuant to a written agreement, or to deposit the funds in a trust or escrow bank account ...

2. "Mortgage brokerage contracts are executed for the purpose of employing a broker to seek financing for the acquisition and development of real estate." D. Barlowe Burke, Jr., *Law of Real Estate Brokers,* §§ 14.2, 14:4 (2d ed. 1999).

provide an enormous incentive to those consumers who use unlicensed mortgage brokers. I suspect that most consumers would happily use unlicensed mortgage brokers, incurring exorbitant fees and hidden charges along the way, if, at the end of the day, they—like Kida—do not have to pay their mortgage.

Finally, the result reached by the majority in this case is absurd. There is no dispute that Novus Financial Corporation loaned $300,000.00 in exchange for a promissory note secured by a mortgage on Kida's property. The Mortgage Warehouse, apparently for the purpose of obtaining fees or commissions, structured the transaction in such a manner that it acted as a conduit through which the money passed its way to Kida and the note and mortgage passed on their way to Novus. The majority holds that, because The Mortgage Warehouse structured the transaction in this manner, the note and mortgage are void and unenforceable. In other words, and I emphasize, the majority punishes the holder of the promissory note because an unlicensed mortgage broker has done precisely what HRS § 454-3(a) disallows it from doing—collecting more fees/commissions.

Accordingly, I dissent.

1. Hawai'i Revised Statutes (HRS) § 454-1 (1993) defines "mortgage broker" as one who performs these activities for compensation, and "mortgage solicitor" as one who engages in such conduct as an employee of or under the direction of a mortgage broker.

2. *See Butler v. Obayashi*, 71 Haw. 175, 177, 785 P.2d 1324, 1325 (1990) (finding that a statute preventing unlicensed contractors from "recovering for work done, or materials or supplies furnished, or both on a contract or on the basis of the reasonable value thereof, in a civil action ... expresses a very strong public policy that contractors in this state should apply for, and receive licenses, ... and the provisions are obviously intended to produce harsh results in furtherance of that policy"); *Jones v. Phillipson*, 92 Hawai'i 117, 125, 987 P.2d 1015, 1023 (Haw. App.1999) (finding that statute vindicated the purposes of "protect[ing] the general public against dishonest, fraudulent, unskillful or unqualified contractors" and "ensur[ing] the health and safety of the public by requiring that contractors possess a minimum level of expertise,

Concurring Opinion of ACOBA, J.

I concur in the result reached by the majority for the reasons that follow.

In my view, this case sits at the crossroads of the public policy nullifying mortgage loan contracts "either directly or indirectly ma[d]e, negotiate[d], [or] acquire[d], or [so] offer[ed,]" [1] by unlicensed mortgage brokers and solicitors as evinced in Hawai'i Revised Statutes (HRS) §§ 454-1 and 454-8 (1993) [2] and the policy favoring the negotiability of promissory notes as essential to the viability of commercial transactions.[3]

Following the command of HRS § 1-16 (1993) that "[l]aws ... upon the same subject matter, shall be construed with reference to each other[,]" it is plain that "contract" in HRS § 454-8 means a "mortgage loan" contract, that is, a contract concerning "a loan secured by a mortgage on real property." HRS § 454-1. Thus, HRS § 454-8 directs that mortgage loan contracts procured by unlicensed brokers or solicitors shall be "void and unenforceable." Void means "[n]ull; ineffectual ... unable, in law, to support the purpose for which it was intended[; a]n instrument or transaction which is wholly ineffective, inoperative, and incapable of ratification and which thus has no force or effect so that nothing can cure it." *Black's Law Dictionary* 1573 (6th ed.1990). An unforcea-

experience and training" by barring civil actions by unlicensed contractors). *Cf. Wilson v. Kealakekua Ranch, Ltd.*, 57 Haw. 124, 129, 551 P.2d 525, 528-29 (1976) (allowing enforceability of a contract by an unlicensed architect, reasoning that "where a statute is silent with respect to the enforceability of a contract whose performance is malum prohibitum, the legislature could not have intended unenforceability where a forfeiture, wholly out of proportion to the requirements of public policy or appropriate individual punishment, would result and redound solely to the benefit of the defendant").

3. *See, e.g., Manor Bldg. Corp. v. Manor Complex Assocs., Ltd.*, 435 Pa.Super. 246, 645 A.2d 843, 846 (1994) ("The purpose of the Commercial Code is to enhance the marketability of negotiable instruments and to allow bankers, brokers, and the general public to trade in confidence."); *Malphrus v. Home Sav. Bank of City of Albany*, 44 Misc.2d 705, 254 N.Y.S.2d 980, 983 (1965) (stating that Article 3 of the Commercial Code "was enacted to protect persons engaged in business transactions involving instruments for payment of money").

**320**

ble contract means "[a] contract having no legal effect or force in a court action." *Id.* at 1528. By the express terms of the statute, such a contract may not be enforced in a court of law.

Under HRS § 454–8, the mortgage loan contract affected is that "entered into by any person with any unlicensed mortgage broker or solicitor." Hence, the illegality of such a contract is not absolved by its assignment to third parties so as to permit foreclosure against the person who contracted with the unlicensed broker or solicitor, as Plaintiff–Appellee Beneficial Hawaii, Inc. appears to assert. Otherwise, the public policy in place would be undermined, and the plain intent of the legislature—to ban contracts involving unlicensed mortgage brokers or solicitors—defeated. Likewise, in light of the legislative mandate, those to whom promissory notes secured by a mortgage are negotiated should only be entitled to relief to the extent available, from the transferor from whom such notes were obtained [4] and not from the maker of the note who entered into contract with the unlicensed mortgage broker or solicitor.

The foregoing results, while in isolation appearing harsh, are merely the consequences of the legislative policy choice embodied in the statute, as to which all parties dealing with mortgage contracts and notes are forewarned, and viewed in that framework, are not unjust.

---

**4.** *See, e.g.,* HRS § 490:3–416 (1993) (listing transfer warranties and stating that "[a] person to whom the warranties ... are made and who took the instrument in good faith may recover from the warrantor as damages for breach of warranty an amount equal to the loss suffered as a result of the breach, but not more than the amount of the instrument plus expenses and loss of interest incurred as a result of the breach").